IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 27, 2021 Session

**STATE OF TENNESSEE v. DEBORAH MORTON**

**Appeal from the Criminal Court for Loudon County**
**No. 2014-CR-156    Jeffery Hill Wicks, Judge**

———————————————————

**No. E2019-01755-CCA-R3-CD**

———————————————————

A Loudon County Criminal Court Jury convicted the Appellant, Deborah Morton, of first degree premeditated murder, and the trial court sentenced the Appellant to life imprisonment in the Tennessee Department of Correction.  On appeal, the Appellant challenges the sufficiency of the evidence sustaining her conviction.  The Appellant also contends that the trial court erroneously excluded and erroneously admitted certain lay and expert testimony, that the trial court erroneously denied her request for a jury instruction concerning the State's failure to preserve evidence, that the State committed prosecutorial misconduct, and that these cumulative errors deprived her of her right to a fair trial.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Valerie T. Corder and Michael R. Working, Memphis, Tennessee (on appeal); and Marcos Garza, Keith Lowe, and Jason Colver, Knoxville, Tennessee (at trial), for the Appellant, Deborah Morton.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Russell Johnson, District Attorney General; and Robert Edwards, Tiffany L. Smith, Lauren Bennett, and Barry Carrier, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

A Loudon County Grand Jury returned an indictment charging the Appellant with the November 6, 2013 first degree premeditated murder of her husband, Ralph Floyd Morton. At trial, Loudon County Sheriff's Office (LCSO) Deputy Jamie Ketner testified that in November 2013, he was a patrolman and that he was called to the Mortons' marital residence at 5:30 a.m. after a suicide was reported to 911. The 911 telephone call made by the Appellant was played for the jury, during which the 911 operator advised the Appellant to apply pressure to the victim's wound. When he arrived first on the scene, Deputy Ketner saw the Appellant through the locked glass storm door as she stood over the victim while talking on the telephone. Upon entering the residence, Deputy Ketner observed the victim lying on his right side on the living room couch. The victim's right arm was hanging over the side of the couch perpendicular to his torso. Approximately one to two feet from the victim, Deputy Ketner saw a black revolver on the floor. He moved the revolver to the kitchen table. Afterward, he returned to the victim and applied pressure to a gunshot wound to the victim's head. Deputy Ketner recalled seeing a bed pillow in a red pillowcase nearby, but he could not recall if he had moved the pillow or if he had found it lying on the floor. Emergency medical personnel arrived ten to fifteen minutes later and began caring for the victim.

Deputy Ketner testified that Sergeant Jerramie Bowen was the next to arrive at the scene. He recalled that Sergeant Bowen took the revolver from the kitchen table and secured it in his patrol car. Deputy Ketner testified that the Appellant did not appear particularly upset. He recalled that she asked him several times if she could take her dog outside to use the bathroom but that he denied the request. He said that the Appellant was "kind of pacing" but that he "didn't see any kind of breakdown or anything like that" from the Appellant. Deputy Ketner recalled that several other officers arrived, including Corporal Ernie Brown, Lieutenant Patrick Upton, and Sheriff Tim Guider. Deputy Ketner learned that the victim's brother, Robert Lynn Morton, lived downstairs in the basement of the home.[1] Deputy Ketner and Sergeant Bowen went downstairs to awaken Mr. Morton. The three men stayed downstairs as other law enforcement personnel arrived and the emergency medical personnel cared for the victim.

On cross-examination, Deputy Ketner testified that he, Sergeant Bowen, and Corporal Brown each arrived at the scene with the siren and blue lights of their patrol cars activated. He explained that activating the siren and blue lights also activated the cars' audio-video recording equipment. However, Deputy Ketner was not wearing his body microphone and could not have made any audio recordings from inside the home. Deputy Ketner testified that it was not his job to preserve the audio-video recordings. Instead, Captain Tony Arden was responsible for preserving audio-video recordings, and Captain Arden did so only at the request of an investigating officer.

---

[1] To avoid confusion, the court will refer to Ralph Floyd Morton as "the victim" and to Robert Lynn Morton, the victim's brother, as "Mr. Morton."

Deputy Ketner agreed that the Appellant sounded upset at the conclusion of the 911 telephone call. He acknowledged that he had never met the Appellant before and was, therefore, unfamiliar with her usual demeanor. He stated that someone had used a towel in an attempt to stop the victim's bleeding prior to his arrival. He recalled that the victim was still breathing when he arrived but that the victim was able to make only "gurgling" sounds. Deputy Ketner recalled that Mr. Morton did not come upstairs of his own accord to see what was happening despite all the noise caused by the arrival of law enforcement and emergency medical personnel.

Deputy Ketner was unsure whether investigators searched the entire residence. He testified that he did not search for other weapons, medications, or signs of an intruder. He stated that nothing immediately made him suspect that the Appellant had killed the victim and that the Appellant did not pose a threat or danger to any of the officers at the scene. He also stated that the Appellant did not appear to be harming the victim when he arrived at the scene. Deputy Ketner recalled that he applied pressure to the side of the victim's head from which the blood was flowing and tried to communicate with the victim that medical assistance was on the way. He testified that he used a green blanket to move the revolver to the kitchen table but that he could not recall if Sergeant Bowen had worn gloves when he moved the revolver to his vehicle.

LCSO Sergeant Jerramie Bowen testified that he arrived at the residence and found Deputy Ketner administering first aid to the victim. Sergeant Bowen said that he knew the Appellant. He explained that he worked at North Middle School as a school resource officer and that the Appellant had worked in the school office as a bookkeeper. He was also familiar with the victim, who was an employee at Norfolk Southern Railway, but he did not know the victim by name. Sergeant Bowen retrieved the revolver from the kitchen table and secured it in his vehicle. He stated that Detective Charles Cosner later collected the revolver as evidence.

Sergeant Bowen recalled that the victim was lying on his right side with a wound to the left side of his head. He took photographs at the scene before the emergency medical personnel arrived and moved the victim to the floor. He found a red pillow with a hole in it and stained with a "significant amount of blood" on the floor. Sergeant Bowen also found a bloodstained towel and blanket near the victim.

Sergeant Bowen testified that the victim was right-handed, so it seemed odd that he was lying on his right side. He telephoned an investigator, which was customary with any death investigation. Sergeant Bowen was not able to determine at the scene if the victim's death was the result of homicide or suicide. He recalled that the Appellant was "very solemn" but was not upset or crying. Sergeant Bowen went downstairs to awaken Mr. Morton and later drove him to the Loudon County Justice Center. Sergeant Bowen testified

that Sheriff Guider arrived on the scene but that Sheriff Guider did not direct or order any particular inquiries in the investigation of the victim's death. Sergeant Bowen acknowledged that his vehicle was equipped with audio-video recording equipment, which he assumed was properly working, but that he did not know whether any recordings were preserved from the investigation.

On cross-examination, Sergeant Bowen testified that he did not know the position of the victim when he was shot and that he did not know if the red pillow had been moved prior to his arrival. He stated that he wore gloves to move the revolver to his vehicle. He recalled that the victim had lost a significant amount of blood and that a towel had been applied to the victim's wound prior to the arrival of the emergency medical personnel. He could not explain why there was little bloodstaining found on the couch underneath the victim's head.

Sergeant Bowen testified that Micah Nicolaus, the victim's pastor, later arrived at the scene. He stated that the scene was not secured as some scenes might have been because the victim's death had been reported as a suicide. Therefore, he did not search for signs of an intruder, collect prescription bottles or other weapons from the home, or otherwise treat the Appellant as a suspect. He also stated that had the audio-video recordings been preserved, they would not have contained any significant information because the call had been treated as a suicide; therefore, the officers did not initiate any questioning at the scene. He stated that Lieutenant Upton was responsible for collecting evidence. Upon leaving the residence that morning, Sergeant Bowen was unable to determine whether the victim's death was the result of homicide or suicide.

LCSO Lieutenant Patrick Upton testified that when he arrived at the scene, Detective Charles Cosner told him that the victim's death was "called in as a suicide" but that "there were some things about the scene that didn't add up." Lieutenant Upton said that the victim's body had been moved from the couch by the time he arrived but that Sergeant Bowen showed him the photographs of the victim's body lying on the couch. Lieutenant Upton described the body's position as "strange." He recalled the red pillow with a hole through it and commented that he had never seen a suicide during which the victim used a "muffle" to minimize the sound of the gun. He made the decision to treat the investigation as a homicide based upon these observations. He testified he later told Sheriff Guider that "something's not right," but Sheriff Guider did not direct the investigation in any manner. Lieutenant Upton conducted a search of the home and found no suicide note. The Appellant consented to Lieutenant Upton's collecting a laptop for analysis. Detective Cosner collected other evidence. Lieutenant Upton saw no signs of disturbance or intrusion inside or outside the home.

Regarding the absence of audio-video recordings from the patrol cars, Lieutenant Upton testified that it was unlikely that consistent recordings could have been made while

inside the home. He explained that when interviewing witnesses, the officers typically moved to the front of a patrol car to ensure consistent recording quality. He also explained that patrol officers, who were the only ones whose vehicles were equipped with recording technology, typically did not interview witnesses at scenes where a death had occurred because those interviews were reserved for investigators. Lieutenant Upton explained that these considerations prompted his decision not to "flag" any audio-video recordings for preservation.

Lieutenant Upton testified that the Appellant went to the Loudon County Justice Center where she was interviewed. A video recording of the interview was played for the jury. During the interview, the Appellant stated that she and the victim had experienced tension in their marriage when Mr. Morton first began living with them. She further explained that the victim was "all about caring for the least and less fortunate" and that she did not want to divorce him, so they eventually "worked through that and [they] rocked right along." Following the Appellant's signing a Miranda waiver, she told Lieutenant Upton that she and the victim had been married for thirty years. She said that the victim snored and, therefore, slept on the couch most of the time. The Appellant described herself as a "light sleeper."

The Appellant told Lieutenant Upton that, earlier on the morning of the victim's death, she awoke to the sound of a "pop." Initially, she did not get out of bed for fear that an intruder was inside the home. However, when she smelled gun smoke, she telephoned 911. During the call, she walked out to check the victim. At the direction of the 911 operator, she applied pressure to the victim's wound with a nearby towel and the red pillow, which she described as "right there." She saw the revolver on the floor to her right as she rendered aid to the victim. When asked if she moved the gun, the Appellant stated that she "was sure that I touched it at some point." She told Lieutenant Upton that the gun appeared to be theirs and that they kept it secured high in a closet so that their granddaughter could not reach it.

She said that she attempted to awaken Mr. Morton by yelling down the stairs but that he remained asleep. The Appellant provided a list of the victim's medications to investigators. She stated that the victim usually stayed up later than she would and that she fell asleep around 10:00 p.m. the night before. She reported that she and the victim had no financial problems and that they owned two homes without mortgages.

When asked if the victim would take his own life, the Appellant said that "he would never." When asked if anyone would want to harm the victim, the Appellant said, "I don't know anyone that would hurt him . . . . [H]e's loved and no one would benefit from his demise." When asked whether Mr. Morton could have killed the victim, the Appellant said that she could not imagine him doing so, but she also said that she did not know of what Mr. Morton was capable. The Appellant denied shooting the victim.

- 5 -

When questioned more extensively about the revolver and why she moved it, the Appellant stated that she was "exhausted," "need[ed] to go home," and "was not lying." She admitted that her fingerprints could be on the revolver and that she had washed her hands in the kitchen sink before Deputy Ketner's arrival because her hands had the victim's blood on them.

In addition to interviewing the Appellant, Lieutenant Upton testified that he collected clothing and saliva samples from the Appellant and Mr. Morton. He also swabbed both individuals' hands. The clothing, saliva samples, and hand swabs were later used in gunshot residue (GSR) testing and deoxyribonucleic acid (DNA) testing performed by the Tennessee Bureau of Investigation's (TBI) crime lab.

On cross-examination, Lieutenant Upton testified that he did not know why the Appellant was uncomfortable with Mr. Morton's living with her and the victim. He described the Appellant's demeanor as "weird" because she laughed at times during the interview, but he did not believe she acted as if she were in shock. Although he characterized the position of the victim's body as "strange," he acknowledged that the body's position did not exclude suicide as the manner of death. Lieutenant Upton testified that no one, including the Appellant, told him that the victim had suffered from depression. Lieutenant Upton did not obtain the victim's medical records, examine his prescription medication, or speak to the victim's physicians as part of the investigation.

Lieutenant Upton acknowledged that the TBI crime lab's testing did not conclude that the Appellant's DNA or fingerprints were on the revolver. He also reiterated that the Appellant did not report that the victim was depressed. The Appellant did not believe that the victim would commit suicide or that Mr. Morton would kill the victim. Lieutenant Upton testified that GSR testing revealed the presence of GSR on the Appellant's clothing, even though she had stated that she was not in the room when the gun was fired. He testified that the revolver used in the victim's death was a Rossi .38 caliber that held five .38 Special bullets. The only bullets found were the one retrieved from the victim's skull via the autopsy examination and the four that remained in the revolver.

Regarding the absence of audio-video recordings, Lieutenant Upton testified on cross-examination that he did not flag any recordings for preservation because the patrol officers, who were the only LCSO personnel equipped with recording equipment, did not ask investigatory questions at the scene and any audio recordings from inside the home would have been sporadic. However, he admitted that he never listened to any audio recordings made from inside the house. Lieutenant Upton acknowledged that in his pretrial affidavit, he said that "none existed" in reference to questions regarding the preservation of the recordings. He explained that he meant no recordings were in the investigation file because he had not flagged any for preservation. Lieutenant Upton acknowledged that

Micah Nicolaus was permitted inside the home while the search was conducted and that Pastor Nicolaus would not have been permitted inside if, at the time, the investigators had suspected the manner of death to be homicide.

On redirect examination, Lieutenant Upton stated that numerous individuals he interviewed never mentioned that the victim suffered from depression. For this reason, he did not seek the victim's medical records. On recross-examination, he stated that the patrol cars were equipped with dashboard cameras but that he did not review their video recordings because "nothing happened in front of those cameras" on the morning of the victim's death. In addition to the absence of reports concerning the victim's depression, Lieutenant Upton stated that the witnesses he interviewed all reported that the victim had plans for retirement, was very active in church, and enjoyed his family.

LCSO Detective Charles Cosner testified as an expert in crime scene management. He said that he arrived at the scene on November 6, 2013, and found emergency medical personnel caring for the victim, who had been moved to the floor. He reviewed the photographs taken by Sergeant Bowen. Detective Cosner testified that he was responsible for collecting and maintaining evidence that was later sent to the TBI for testing. While wearing gloves, Detective Cosner collected the revolver from Sergeant Bowen's vehicle. Detective Cosner said his understanding was that the revolver had been first recovered from the floor in front of the couch. He stated that the Rossi .38 caliber handgun was identified as the weapon that fired the shot that killed the victim. He identified the four live rounds and one spent cartridge collected from the revolver. He also identified the bullet taken from the victim's skull at the autopsy, which he had attended.

Detective Cosner testified that he collected the Appellant's clothing for DNA and GSR testing. He admitted that contamination sometimes can occur as an investigation unfolds due to unintentional movement of evidence. He explained that investigators try to prevent contamination by changing gloves and individually bagging items of evidence that were not collected at the same time and from the same individual. Detective Cosner collected Mr. Morton's t-shirt, jeans, and shoes. Detective Cosner swabbed the back of the couch behind the victim's head for the presence of GSR and collected the victim's clothing for GSR testing. Likewise, he collected GSR testing kits from the hands of the victim, the Appellant, and Mr. Morton. He also collected buccal swabs from the Appellant and Mr. Morton to be used for DNA comparison. Regarding the GSR testing kit collected from the victim's hands, Detective Cosner testified that he sent someone to the hospital to place bags on the victim's hands because the victim had been transported to the hospital without anyone bagging his hands. He also stated that the victim's hands were not swabbed until the autopsy, which was performed on the afternoon of the victim's death.

Detective Cosner testified that the victim was positioned as if he had been sleeping, covered by a blanket. He explained that the red pillow had a hole surrounded by GSR on

one side.  On the other side, the pillow had an exit hole surrounded by some blood and two considerable blood stains in other areas.  He testified that he had responded to "probably several hundred" suicides, and he did not think that a person would lie down, cover himself with a blanket, and place a pillow on the side of his head in order to shoot himself.  Accordingly, Detective Cosner found the red pillow to be a significant piece of evidence.

On cross-examination, Detective Cosner stated that if someone had moved the pillow, the pillow "would probably leave some deposits" of GSR on their clothing.  He also admitted that the red pillow appeared to be from the guest bedroom because the pillowcase did not match those found in the Appellant's bedroom.  He stated that the swabs from the couch, the Appellant, and Mr. Morton were collected at approximately 7:00 a.m., within hours of the victim's shooting, but that the swabs from the victim's hands were collected at 2:30 p.m. at the autopsy.  He also admitted that the body bag in which the victim was transported and the bags on the victim's hands were not tested for GSR.  He said that there was no way to determine how much GSR, if any, had been transferred to those items.  He acknowledged that the Appellant's fingerprints and DNA were not found on the revolver.  He testified that he informed the medical examiner concerning the victim's position, the pillow's position, and that the victim was right-handed.  Detective Cosner opined that, based upon his experience, the victim did not commit suicide.

Dr. Christopher Lochmuller, Chief Deputy Medical Examiner for Knox and Anderson Counties, testified as an expert in forensic pathology.  He testified that he also worked as a forensic pathology consultant to the Loudon County Medical Examiner.  He explained that while he usually prepared death certificates for deaths occurring in Anderson and Knox Counties, he only prepared a death certificate in a Loudon County case when the victim was injured in Loudon County but later died in Knox County.  For this reason, he did not prepare the death certificate in this case.  Dr. Lochmuller explained that an autopsy was performed to determine cause and manner of death.  Once cause of death was determined, there were five manners of death: homicide, accidental, natural, suicide, and undetermined.

On the afternoon of November 6, 2013, Dr. Lochmuller performed the autopsy of the victim.  He determined the cause of death to be a single gunshot wound to the head, with no exit wound.  Dr. Lochmuller observed no stippling, searing, or muzzle marks at the entry wound.  He further observed scraping, which he explained indicated that an "intermediary item" was in contact with the victim's head and that the bullet was fired through the intermediary item before entering the victim's head.  Dr. Lochmuller retrieved a bullet from the right side of the victim's brain, nearly behind the victim's right eye.  He described the trajectory of the bullet as downward from left to right.

Dr. Lochmuller testified that he collected blood samples to obtain a toxicology report.  He said that the Tennessee Controlled Substances Database showed that the victim

had been prescribed a twenty-one-day supply of hydrocodone on October 28, 2013, just nine days before his death. However, the victim's blood showed no evidence of "drugs of abuse."

Dr. Lochmuller testified that the autopsy report also included several secondary findings concerning the victim's overall health at the time of his death. Most notably, Dr. Lochmuller testified that the victim's heart was enlarged to twice the normal size; the victim showed evidence of hypertensive cardiovascular disease; the victim showed signs of adrenal micro-nodular hyperplasia, which was a malformation of his adrenal glands; the victim suffered from arteriolar nephrosclerosis, which was kidney damage caused by high blood pressure; and the victim was morbidly obese, weighing 270 pounds with a height of five feet and seven inches.

As to manner of death, Dr. Lochmuller explained that determining manner of death from a gunshot wound is dependent upon the circumstances presented, including the position of the victim's body, where the death occurred, and whether the victim's own gun was used. He opined that all of those factors may point to suicide as the manner of death but that most suicides by gunshot occur when a victim puts a gun in their mouth or there was close-contact with the gun's muzzle. He further opined that it was "unusual" for a suicide to occur involving the use of an intermediary item such as occurred in this case. Dr. Lochmuller testified that a left-side suicide wound was typically inflicted by a left-handed victim. He also opined that a right-handed person would have had difficulty firing a gun at the angle of the victim's wound. Regardless, Dr. Lochmuller concluded that the manner of death in this case was undetermined.

On cross-examination, Dr. Lochmuller testified that the absence of hydrocodone in the victim's blood could be attributed to the victim's taking the medication in the days leading up to his death but not within the two days immediately prior to his death. He also testified that he could not rule out suicide as the manner of death because there were cases of individuals committing suicide with their non-dominant hand.

Recently retired TBI Crime Lab Investigator Teri Arney testified as an expert in firearms examination. She testified that the bullet recovered from the victim's brain had been fired by the Rossi .38 caliber revolver collected at the scene. She further testified that the soot pattern on the red pillow indicated a "contact gunshot" because the cylinder gap of the revolver had been close enough to the pillow when fired to deposit soot on the pillow. She further explained that the pillow also contained evidence of unburned gun powder, indicating that the cylinder gap of the revolver was "really, really close," "less than three inches[,] and most likely . . . less than an inch" from the pillow when fired.

On cross-examination, Investigator Arney testified that her testing could not determine the exact position of the red pillow on the victim's head or who had fired the revolver. Therefore, her analysis could not determine the manner of death.

Retired TBI Special Agent James Russell Davis, II, testified as an expert in gunshot residue analysis. Agent Davis prepared two reports: one report from an analysis of the Appellant's and Mr. Morton's clothing and a second report from an analysis of kits from the Appellant's, Mr. Morton's, and the victim's hands. He did not analyze the testing sample taken from the couch because it was already known that the victim had been shot while on the couch. Therefore, he expected the presence of GSR on the couch.

Agent Davis testified that he found no elements of GSR on the hands of the Appellant, the victim, or Mr. Morton. His analysis revealed, however, the presence of GSR on the Appellant's clothing. He explained that this indicated that the Appellant was near a gun when it was fired, came into contact with a recently fired gun, or had herself recently fired a gun. Agent Davis' analysis of Mr. Morton's clothing showed the presence of an insignificant amount of gunshot particles, which he explained could have been deposited by a transfer from another source.

On cross-examination, Agent Davis stated that his analysis of the test kit from the victim's hands did not reveal the presence of GSR. He explained that GSR was expected to be found on a suicide victim's hands but that the absence of GSR did not exclude suicide as the manner of death. He said that his testing did not rule out suicide because he could not determine how much, if any, GSR rubbed off the victim's hands or clothing during the time between the shooting and the collection of the samples. Therefore, he opined that the test results from the victim's hands were inconclusive. Agent Davis acknowledged that the GSR found on the Appellant's clothing could have been transferred from the victim or the couch while she rendered aid to the victim.

On redirect examination, Agent Davis testified that the small amount of particles found on Mr. Morton's clothes could have been transferred from Sergeant Bowen, who had collected Mr. Morton's clothing after handling the revolver. He stated that there was no absolute way to know how the evidence found on the Appellant's clothing had been deposited there.

TBI Special Agent Charly Castelbuono testified as an expert in DNA analysis. She examined the revolver and the known DNA samples of the victim, the Appellant, and Mr. Morton. She stated that the revolver contained no blood evidence and that the DNA source was predominantly epithelial cells. She detected the presence of two DNA contributors on the revolver, with the victim being the major contributor. She was able to exclude the Appellant and Mr. Morton as the other DNA contributor on the revolver. By agreement of

the parties, Agent Castelbuono also testified that Special Agent Harry Woods' fingerprint analysis found no identifiable fingerprints on the revolver.

On cross-examination, Agent Castelbuono testified that the DNA and fingerprint analyses did not link the Appellant to the revolver. On redirect examination, Agent Castelbuono stated that if someone had touched the revolver without gloves on, DNA could be expected to be found on the revolver. She further stated that had the Appellant worn gloves, no DNA evidence would be on the revolver. On recross-examination, Agent Castelbuono testified that no gloves had been submitted for analysis. She also confirmed that neither the green blanket nor the towel had been submitted for DNA analysis.

LCSO Criminal Investigator Jason Smith testified that he had assisted the investigators by issuing subpoenas in this case. He prepared subpoenas for and received documents related to life insurance policies owned by the victim. One policy, valued at $110,000, listed the Appellant as the primary beneficiary and the victim's daughter, Allison Morton, [2] as the contingent beneficiary.

On cross-examination, Investigator Smith stated that no one contacted the insurance company on the day of the victim's death. He also admitted that his statements contained in the applications for subpoenas were based upon information conveyed to him by other officers because he did not have firsthand knowledge of the investigation of the case. He stated that he was told that a "death benefits application" had been downloaded in the days before the victim's death. He stated that he did not know that the downloaded document had been mischaracterized as a death benefits application. Agent Smith testified that he only sought subpoenas at the direction of an investigator. He said that Lieutenant Upton never requested subpoenas for the victim's medical or prescription records.

LCSO Information Technology Director Jason Tuttle testified that he examined the Appellant's laptop computer. He noted that on October 30, 2013, Vanguard denied a "hardship withdrawal request" from the victim's retirement account. The after-tax amount of the withdrawal was $17,986.73. Mr. Tuttle also testified that on October 3, 2013, Vanguard had approved an $8,100 withdrawal request from the same retirement account. Mr. Tuttle noted that the computer's internet search history included searches for pepper spray and voice changers. He testified that on the computer, he also found the Appellant's American Express statement, which showed a $10,570.38 balance.

On cross-examination, Mr. Tuttle acknowledged that the laptop was a family computer used by multiple people. He did not know if the hardship withdrawal requests were made to pay for college tuition. He also stated the life insurance document that had

---

[2] To avoid confusion, the court will refer to Deborah Morton as "the Appellant" and to Allison Morton as "Ms. Morton."

- 11 -

been characterized as a death benefits document by officers in affidavits for a search warrant and subpoenas was actually a "living owner" customer service request that was routinely used to change a beneficiary. Mr. Tuttle confirmed that the laptop contained no references to suicide.

TBI Assistant Special Agent James Reeves Garnett testified as an expert in computer forensics. Based upon the information provided by investigators, Agent Garnett highlighted several internet searches for pepper spray and voice changers that occurred on October 30, 2013. He also highlighted a November 4, 2013 internet search about booking a private jet. Agent Garnett stated that there was no way to determine who had performed the internet searches. On cross-examination, he said that he did not find a search regarding "how to get away with murder" and would have flagged such information if he had seen it.

Micah Nicolaus testified that he was the pastor at the victim's church, Lenoir City United Methodist Church, for the last three and one-half years of the victim's life. He said that the victim volunteered at the church most Fridays and, through the victim's service, Pastor Nicolaus had frequent contact and conversations with the victim. He recalled that the victim acted as a volunteer handyman around the church, often spent time on ladders, and did not complain of pain. He described the victim as an "avid golfer" who had recuperated successfully from double knee replacement in June 2012. He recalled that the victim loved his daughters, April and Allison, and loved his granddaughter, Natalie. He knew that the victim was making plans to retire in about three years and that he intended to play the Bear Trace golf courses with his close friend, Jack James. Pastor Nicolaus described the victim as jovial and happy in the days leading up to his death. He said that the victim never expressed suicidal thoughts to him.

On cross-examination, Pastor Nicolaus acknowledged that sometimes Christians committed suicide. He reiterated, however, that the victim was making plans for retirement, loved his family, loved helping the church, never indicated that he was experiencing marital difficulties, and maintained a happy disposition.

April Morton Anderson testified that she was the victim's daughter and mother of his granddaughter, Natalie. She recalled that in April 2013, the victim accompanied her and Natalie on a school field trip to the Knoxville Zoo because Ms. Anderson had broken her foot. Ms. Anderson stated that the victim pushed her in a wheelchair throughout the zoo, despite being less than a year from his double knee replacement. In May 2013, the victim attended Natalie's kindergarten graduation, and they celebrated together by going out to breakfast. She recalled that the victim gave Natalie a set of "fake pearls" for kindergarten graduation because Natalie had admired the pearls that the victim had given Ms. Morton for her college graduation. In September 2013, the victim built a memorial for Ms. Anderson's deceased dog, Daisy, and held a special funeral for the pet. Over Labor Day weekend in 2013, the family traveled to Louisville, Kentucky, where they celebrated

the victim's and Ms. Morton's birthdays. On Halloween 2013, the victim carved pumpkins with Natalie. Ms. Anderson recalled that the victim planned to take two weeks' vacation that Christmas to spend time with Natalie and to build a shelving unit in Ms. Anderson's garage. Ms. Anderson testified that she found the materials for the project in the victim's garage following his death.

Ms. Anderson testified that the victim was always in the same mood, never seemed depressed, and was not in pain. She recalled that the Appellant wanted to move to a family home she had inherited recently in Georgia. She said that the victim did not want to move to Georgia and told Ms. Anderson that "the only way I'm leaving this house is ten toes up." Ms. Anderson also remarked that the victim did not want to leave Loudon County while his mother was still alive because he cared for his elderly mother in many ways. She recalled an occasion at the Appellant's and victim's home when the Appellant said, "I swear I'm going to murder your father." Ms. Anderson explained that the Appellant "was frustrated" when she made the comment and that Ms. Anderson had not thought much of the comment at the time but that the comment "kind of haunts me." Ms. Anderson also recalled that the Appellant and Ms. Morton went on vacation to Savannah, Georgia, while the victim was in an orthopedic rehabilitation facility following his double knee replacement surgery.

Ms. Anderson testified that the victim always slept in the same position, often on the couch, and was a heavy sleeper. She recalled having a "totally normal" conversation with the victim on her way home from work on November 5, 2013. She said that "everything about [November 6, 2013,] was weird" beginning with the Appellant's early morning telephone call to say "your dad's gone to heaven to live with Jesus." She said that the Appellant remained very calm. The family met at the Mortons' home later that day. When Ms. Anderson arrived, she observed new furniture in the living room and everyone eating Zaxby's chicken. She said that she never saw the Appellant cry that day. She testified that the first time she saw the Appellant shed any tears regarding the victim's death was the night before the grand jury met when the Appellant expressed her fear that she would be charged.

Ms. Anderson testified that the Appellant moved to the "mountain home" in Georgia within days of the victim's death. She stated that the Appellant telephoned her in May 2014 to let Ms. Anderson know that she was coming into town to clean out the Loudon County house. Ms. Anderson recalled that the home was cleaned in three days and soon sold. While cleaning the house, Ms. Anderson found a box of cards that the victim had given the Appellant. She testified that the Appellant abandoned the box of cards "for junk" by telling Ms. Anderson to "just leave it."

On cross-examination, Ms. Anderson testified that the Appellant told her that the victim had injured himself and that it appeared to be self-inflicted. Ms. Anderson testified that the "last thing to cross her mind was suicide."

Teddy Lynn Bivens testified that he and the victim were very close friends. He recalled that the victim was in no pain following the double knee replacement surgery. He stated that the victim attended the church's Memorial Day Weekend 2013 golf trip and had no difficulty playing golf all weekend. He stated that the victim told him that his knees felt better than they did in high school.

Mr. Bivens testified that he and his wife were married the same year as the victim and the Appellant. The couples celebrated their twenty-fifth wedding anniversaries together in Las Vegas. In June 2013, the couples celebrated their thirtieth wedding anniversaries together on an Alaskan cruise. Mr. Bivens testified that the victim spent most of the Alaska trip with him and his wife, while the Appellant and their daughter, Ms. Morton, pursued their own activities.

Mr. Bivens testified that the victim told him that the Appellant was "hell bent to move to Georgia" but that the victim did not want to leave Loudon County. He said that the victim oversaw his elderly mother's finances and care.

Mr. Bivens also recalled a conversation he had with the victim about a friend who was contemplating suicide after a long battle with cancer. The victim told Mr. Bivens that their friend would "end up in a place he do[es]n't want to be" if he committed suicide.

Mr. Bivens testified that the victim accompanied him to an orthopedic doctor's appointment on November 1, 2013. While there, the victim discussed his retirement plans to play the Robert Trent Jones Golf Trail with friends. When asked what he was planning for a thirty-fifth wedding anniversary celebration, the victim told Mr. Bivens that there would not be a thirty-fifth anniversary because "all the love is gone" and the couple's "arguments had gotten real extreme." The victim also confided that he was planning to make changes to his beneficiaries and to restrict the Appellant's access to the couple's money. During this same conversation, the victim told Mr. Bivens that he did not want to be near the Appellant and a loaded gun.

At the conclusion of Mr. Bivens' testimony, the State rested its case. The trial court overruled the Appellant's motion for a judgment of acquittal. The Appellant then presented proof in her defense.

Stephanie Horner, a forensic scientist with the R.J. Lee Group, testified as an expert in GSR analysis. She concluded that Mr. Morton's t-shirt contained one three-component GSR particle and one two-component GSR particle.

On cross-examination, Ms. Horner admitted that the samples may have become contaminated in shipping. She also explained that, unlike the TBI's methodology, her methodology did not require a minimum reporting threshold. Instead, she reported all particles, no matter how limited, and explained their significance. She admitted that her findings concerning Mr. Morton's t-shirt were "not conclusive" and that the particles could have been transferred from Sergeant Bowen.

Robert Lynn Morton, the victim's brother, testified that he had lived with the victim and the Appellant for approximately two years at the time of the victim's death. He said that the victim was helpful and kind to his family. He also said that the Appellant had "always been okay" to him. He lived in the couple's basement and could often hear them walking upstairs. He said that the victim and the Appellant never argued and seemed fine, even if they did not do a lot together. He testified that he worked second shift and hardly saw the couple. He testified that he could not see the Appellant killing the victim. He also denied shooting the victim.

On cross-examination, Mr. Morton testified that the police came downstairs to awaken him on the morning of the victim's death. They initially did not tell him about the victim. However, Sheriff Guider eventually told him that the victim had committed suicide. Mr. Morton did not believe it and believed the shooting must have been accidental. Mr. Morton recalled that the Appellant had quit her job in the year preceding the victim's death and that she had taken a vacation while the victim completed orthopedic rehabilitation. He also stated that the victim was physically active. Mr. Morton never suspected suicide and said that the victim displayed no signs of suicide. Mr. Morton said that he had put on clothing he had worn the previous night when the police came downstairs. He said that he gave the Appellant a hug and then later gave his clothing to investigators for testing. He stated that when he returned from his interview at the Loudon County Justice Center, the old living room furniture was on the front porch of the home and that someone from the church had cleaned the living room. He recalled that the Appellant wanted the couch removed so the couple's daughters would not see it. He said that the Appellant moved to Georgia the week after the victim's death.

Wendy Messler testified that she had known the victim and the Appellant through church for about fifteen to twenty years. She said she and the Mortons also had homes near Blue Ridge, Georgia, and that they would often celebrate holidays together with their families. Sometime near the end of October, the victim complained to Ms. Messler, who was a nurse, about severe back pain. At the time, she suspected that the victim was suffering from kidney stones. Ms. Messler never heard the victim complain about the Appellant. She recalled the couple's loving relationship and how well the Appellant took care of the victim.

- 15 -

Don Whalen testified that he lived in Blue Ridge, Georgia. He said that while checking a leak in the Appellant's roof, he noticed her father's guns in a closet. He said that the Appellant asked him to bring the guns down from the closet and check them for safety. He recalled that he checked the guns and returned them to the closet. He stated that the Appellant did not know anything about guns and did not appear comfortable handling them.

Allison Morton, the couple's daughter, testified that her parents loved each other and were "each other's better halves." She said that her parents were financially supportive of her educational pursuits. She described the victim as kind, helpful, and loving. She said that the Appellant took care of everyone. She also explained that the pepper spray search on the computer was for her. Ms. Morton reported that she was diagnosed with bipolar disorder and took anti-depressant medications. She also recalled that the victim's mother had been diagnosed with bipolar disorder.

On cross-examination, Ms. Morton acknowledged that she did not want her mother to go to prison. Ms. Morton said that she had begun medical school in the fall of 2013 and had graduated from medical school in 2017. She recalled that the victim was under a lot of stress near the end of his life. She stated that the victim had been taking pain medication at night for a bout of kidney stones. She had no knowledge of the victim's comments to Mr. Bivens regarding plans for the couple's thirty-fifth wedding anniversary or the victim's intention to change the beneficiaries on his life insurance policy.

Mike Stidham, the Appellant's cousin from Michigan, testified that he visited the Appellant and victim approximately twice a year. He described the couple as happy and loving and said that he never observed any marital discord between them.

Celia Carolyn Hartnett testified as an expert in GSR analysis. She opined that GSR was not always found on a suicide victim's hands. She testified that in this case, her methodology confirmed the presence of GSR components on the victim's hands and was consistent with the victim's firing the revolver. She acknowledged, however, that the same level of GSR components could have been found if someone else had fired the revolver. She opined that the test results of the GSR on the Appellant's and Mr. Morton's hands did not meet the threshold of a positive result.

Dr. Carl Orthoefer testified as an expert in hospital medicine and internal medicine. He reviewed the victim's medical records and met twice with Dr. Lochmuller regarding the victim's autopsy. He testified that the victim died from a gunshot wound to the head. The victim was also morbidly obese with a body mass index of 41. He suffered from an enlarged heart, thickening of the heart muscle, hypertensive cardiovascular disease, adrenal micro-nodular hyperplasia, and scarring of the blood vessels in the kidneys. Dr. Orthoefer testified that the adrenal micro-nodular hyperplasia could have caused increased cortisol

production. He could not specifically diagnose the victim with having increased cortisol production because he did not examine and treat the victim while the victim was alive, but he noted that the victim displayed features of increased cortisol production. Dr. Orthoefer explained generally that someone with increased cortisol production may experience kidney stones, suffer from high blood pressure, diabetes, inflammation, decreased muscle, weight gain, depression, suicidal ideation, low testosterone levels, reduced immune response, obstructed sleep apnea, skin changes, and high cholesterol.

Remarkably, the victim's medical history revealed many of these ailments. Dr. Orthoefer testified that the victim had been diagnosed with high blood pressure, high cholesterol, a history of kidney stones, extensive diabetes, obesity, low testosterone, "extremely obstructed sleep apnea," recurring sinus infections, depression dating back to 2002, severe enlargement of the heart, and chronic pain. At the time of his death, the victim was prescribed Citalopram (Celexa) for depression, four blood pressure medications, three diabetes medications, two pain medications: non-narcotic Mobic and narcotic hydrocodone, and subcutaneous testosterone replacement. The victim's medical records also revealed that the victim had passed seven kidney stones on October 29, 2013. Dr. Orthoefer explained that diagnosing an adrenal gland malformation was difficult but that had it been diagnosed, the victim's doctor could have screened the victim for increased cortisol production. It appeared, however, that the victim was only treated for the various symptoms of increased cortisol production and not for an adrenal gland malformation.

On cross-examination, Dr. Orthoefer acknowledged that he never examined the victim while he was alive and that he had only reviewed the victim's medical records and autopsy report. He acknowledged that the medical records contained no evidence that the victim had expressed suicidal thoughts, but Dr. Orthoefer opined that patients often did not disclose suicidal ideation to their physicians.

Lori Copeland testified that she had known the Appellant since they worked together in 1983. She said that they remained friends for over thirty years and that she socialized often with the Appellant and the victim. She said that she witnessed "nothing but love" between the Appellant and the victim and described their marriage as "perfect." On cross-examination, she denied a conversation in which she accused the Appellant of stealing her medication. She admitted that the Appellant had texted her sometime after the victim's death and expressed her wish that she could change her name and "forget everything about her marriage." Ms. Copeland explained that the Appellant had said this because she was overwhelmed by the attention surrounding the case and the attitudes of people around her.

Judy Goddard Wehunt testified that she had known the Appellant for fifteen years through the Appellant's father. She described the Appellant as peaceful, loving, and calm. She said she had never seen the Appellant with a gun.

On cross-examination, Ms. Wehunt testified that she did not know April Morton Anderson but that she did know Allison Morton. She also admitted that she had had the most contact with the Appellant in the past eighteen months leading up to the trial.

Patricia Lovelace testified that she had known the Appellant for approximately twenty years, having met her through their daughters. She described the Appellant as kind and caring. She never heard the Appellant complain about the victim or their marriage.

Anita June Krantz testified that she had worked with the Appellant at North Middle School. She described the Appellant as kind and nurturing and "always . . . there for everybody." She testified that the Appellant loved the victim.

William D. Bailey testified that he was the Appellant's cousin. He said that they had spent many weekends together growing up, stayed in touch as adults, and had regular contact for the past five to six years. He testified that the Appellant has "always been happy and kind."

On cross-examination, Mr. Bailey said that until the Appellant moved back to Georgia, he would see her once a year at the annual family reunion. He also admitted that he had never visited the couple in Loudon County.

Shayna Lovelace testified that she grew up in Lenoir City where she was good friends with Allison Morton. She recalled that the Appellant worked at her middle school. She spent a lot of time at the Morton home while in middle and high school and described the victim as a "really nice, very friendly guy." As an adult, she stayed in touch with the family. She described the couple's marriage as loving.

On cross-examination, Ms. Lovelace said that she did not know April Morton Anderson and did not know the victim's friends. On redirect, she recalled that the victim often slept on the couch or in the recliner with the television on.

Dr. Jimmie L. Valentine testified as an expert in pharmacology and toxicology. He reviewed the victim's pharmacy records and determined that the victim was not taking all of his prescribed medications consistently. He noted that the victim's intake of pain medications had increased over time. He also noted that the victim had last refilled a prescription for Celexa, to treat depression, on May 21, 2013. At the time of his death, the victim had only taken about half of the ninety pills that had been prescribed. Dr. Valentine explained that serotonin withdrawal syndrome could occur when a patient failed to take his depression medication properly. If this occurred, the depression would rebound and return with greater intensity.

On cross-examination, Dr. Valentine acknowledged that he was testifying from the victim's records and not from an examination of the victim while alive. He also noted that the police did not collect the prescription bottles, as he would have preferred, so he relied upon bottles provided by the Appellant to establish medication counts. Dr. Valentine also admitted the certain gaps in prescriptions could have been caused by the victim's hospitalizations. On redirect examination, Dr. Valentine testified that the victim had not taken any Hydrocodone for at least two days before his death for it not to have shown up in the autopsy toxicology screen. He opined that someone who was not "opiate naive" could take more than the prescribed daily amount if in severe pain from, for example, kidney stones. He also stated that even if all of the Celexa had been taken as prescribed, the victim would still have been noncompliant because more than ninety days had elapsed since his last Celexa refill. On recross-examination, Dr. Valentine said that the victim was not opiate naive.

Following a <u>Momon</u> colloquy, the Appellant chose not to testify, and the defense rested. The trial court denied the Appellant's renewed motion for a judgment of acquittal. The State then chose to present rebuttal proof.

Kristin J. Rice testified that she had known the victim since 1996 through her part-time employment at Lenoir City United Methodist Church. She recalled last seeing the victim on the weekend before his death when he came to her home to install ceiling fans. She recalled that the victim was not in any physical distress at the time, that his demeanor was normal, and that he was "just a happy person." She said that the victim loved his daughters and granddaughter. She said that the victim was not looking forward to retirement because he loved his job. She never saw the victim sad or depressed. The victim had also told her that he did not want to move to Georgia with the Appellant and that he wished the Appellant would go back to work.

Carol Ann Williams testified that she had known the victim about twenty-two years through church and as his barber. She said that the victim seemed fine in the weeks before his death. She also recalled a conversation they shared regarding suicide in which the victim described suicide as the "easy way out" and expressed his belief that anyone who committed suicide was "going to hell."

Holly Bivens, the victim's cousin, testified that the Appellant regularly fired her father's guns. She said that the Appellant had shown her and a friend how to comfortably handle guns. She recalled that the Appellant was not very upset or distraught on the day of the victim's death. She also recalled overhearing a conversation between Allison Morton and the Appellant during which Ms. Morton questioned the Appellant's saying that the victim had committed suicide. On cross-examination, she explained that Ms. Morton thought the victim had accidentally shot himself.

Jack James testified that he and the victim were close friends who planned to play the Robert Trent Jones Golf Trail once they both retired. He described the victim as being raised a "hard shell Baptist" who believed that people who committed suicide were going to hell. Regarding the Appellant's desire to move to Georgia, Mr. James recalled the victim's saying "she could take her happy butt to Georgia and he would stay" in Loudon County. Mr. James also said that the victim was making plans to provide for his granddaughter Natalie's education. On cross-examination, Mr. James explained that the victim was not demeaning toward the Appellant about living separately but that he understood that the victim felt they both would be happier living apart.

Scott Cordell testified that he worked with the victim at Norfolk Southern. He recalled that the victim was always in a good mood and that he was not depressed or withdrawn. He never heard the victim complain about his knees. In fact, he was surprised to learn that the victim had double knee replacement surgery. He said that the victim never seemed sleepy or impaired at work. He testified that the victim gave him some .38 Special shells that appeared to be very old. He and the victim worked together on November 5, 2013, and it was a normal day. On November 6, 2013, at 5:50 a.m., the Appellant texted Mr. Cordell to tell him that the victim had injured himself and would not be at work. The Appellant had never contacted Mr. Cordell before, so he telephoned her at approximately 6:20 a.m., but the Appellant did not answer the telephone.

Based upon the foregoing, the jury convicted the Appellant of first degree premeditated murder. The trial court imposed a sentence of life imprisonment. The Appellant filed a timely motion for new trial, which was denied by the trial court. The Appellant then filed a timely notice of appeal. On appeal, the Appellant argues that the trial court erred in admitting lay testimony and excluding expert testimony, that the trial court erred in denying the Appellant's request for a jury instruction concerning the State's failure to preserve evidence, that the State committed prosecutorial misconduct, that the evidence is insufficient to support her conviction, and that cumulative errors deprived her of her right to a fair trial. We will address these issues in a different order than that in which they were raised by the Appellant.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant contends that the evidence was insufficient to sustain her conviction of first degree murder. The Appellant asserts that the State presented no evidence of premeditation and no eyewitness testimony, confession, or forensic evidence to establish her identity as the shooter. She claims that the State's case was based "upon gossip and speculation." Essentially, the Appellant argues that "[o]nly suicide was consistent with the

facts" presented. The State responds that "the jury had more than sufficient evidence to conclude [the Appellant] intentionally shot [the victim] after premeditation."

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

The Appellant was convicted of first degree premeditated murder, which is the "premeditated and intentional killing of another." Tenn. Code. Ann. § 39-3-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d).

Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the Appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the Appellant's declarations of intent to kill; (3) the Appellant's planning activities before the killing; (4) the manner of the killing, including the Appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the Appellant's demeanor before and after the killing,

including a calm demeanor immediately after the killing.  See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

In the light most favorable to the State, the proof at trial revealed that the Appellant and the victim had experienced some marital difficulties that involved escalating arguments.  Witnesses testified that the couple disagreed about where to reside during retirement, with the victim refusing to move to Georgia and the Appellant insisting she wanted to live in Georgia.  The Appellant moved from the marital residence to Georgia within days of the victim's death.  Near the time of his death, the victim had reported dissatisfaction with the couple's marriage.  He had also expressed some fear of the Appellant.  The Appellant's stepdaughter testified that the Appellant had voiced an intention "to murder" the victim, which the stepdaughter said may have been "nothing" but nevertheless "haunt[ed]" her.

The victim died from a single gunshot wound to the left side of his head and was found lying on his right side, with his dominant hand underneath his body.  The revolver was fired through a pillow to muffle the sound of the shot.  Witnesses testified that the position of the victim's body and the use of the pillow as a muffler made it questionable whether the manner of death was suicide.  Further, witnesses remarked that the victim's demeanor did not change in the days leading up to his death and that he remained the same calm and happy individual who was making plans for the immediate future as well as for his retirement.  Although the Appellant presented evidence of the victim's declining health as a possible explanation for suicide, no witnesses testified that the victim had ever been suicidal or was suicidal in the days leading up to his death.

Although the Appellant presented the theory that the victim committed suicide, the jury, as was their prerogative, rejected that theory and chose to accredit the testimony of the State's witnesses and rejected the Appellant's theory.  We conclude that the evidence is sufficient to convict the Appellant of first degree premeditated murder.

We note that in challenging the sufficiency of the evidence, the Appellant also challenges the trial court's evidentiary rulings, contending that without considering the improperly admitted evidence, the jury would not have found her guilty beyond a reasonable doubt.  The Appellant further asserts that this court's analysis of the sufficiency of the evidence "requires acknowledgement of the exculpatory nature of the excluded evidence."  However, our examination of the sufficiency of the evidence requires the court to examine "all of the evidence admitted at trial in order to determine whether each of the elements [of an offense] is supported by adequate proof."  State v. Stephens, 521 S.W.3d 718, 724 (Tenn. 2017).

Within her sufficiency argument, the Appellant also contends that the trial court improperly "prevented the Defense from impeaching Mr. Morton's credibility before the

jury by questions about his recent release from prison," citing to Tennessee Rules of Evidence 608 and 609. The Appellant fails to cite to the portion of the record when this alleged limitation occurred; accordingly, this issue is waived for failing to properly cite to the appellate record. It is also waived for failing to include the issue in the Statement of Issues. See Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(4).

## B. Evidentiary Issues

On appeal, the Appellant questions whether the trial court "improperly include[d] lay opinion testimony and exclude[d] expert testimony in violation of the Sixth and Fourteenth Amendments." We will address each of these issues in turn.

### (1) Lay Opinion Testimony

### a. Hearsay

The Appellant contends that the State's witnesses were improperly allowed to testify to hearsay regarding "their anecdotal (factually incorrect) opinions of [the victim's] robust psychological and physical health and the flawed character of [the Appellant], all ostensibly pursuant to" Tennessee Rule of Evidence 803(3). The State responds that, other than a few instances, the Appellant has waived this issue by failing to specify the statements to which she is complaining and to provide citations to the record to support her complaints. We agree with the State.

Initially, we note that hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible except as provided by the rules of evidence or otherwise by law. Tenn. R. Evid. 802. The exception to the prohibition against hearsay to which the Appellant draws our attention is Tennessee Rule of Evidence 803(3), which provides:

> **Then Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Notably, "only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." Id., Advisory Comm'n Cmts.; see State v. Howard, 504 S.W.3d 260, 282-83 (Tenn. 2016); State v. Hutchison, 898 S.W.2d 161, 171 (Tenn. 1994).

- 23 -

Initially, we note that the Appellant argues that because none of the State's witnesses testified regarding the victim's state of mind as it related to the making of his will, their hearsay testimony should have been excluded. The Advisory Commission Comments to Rule 803(3) explain:

> Combining the hearsay exception with relevancy principles, declarations of mental state will be admissible to prove mental state at issue or subsequent conduct consistent with that mental state.
>
> Normally such declarations are inadmissible to prove past conduct. Most jurisdictions, however, admit express mental state to prove the prior making or revocation of a will. Tennessee is in the minority by excluding the evidence in wills cases.

See Neil P. Cohen et al., Tennessee Law of Evidence, § 8.08[7][a] (6th ed. 2011) ("Rule 803(3) contains a useful relaxation of the prohibition against proof of mental condition to prove past conduct. This exception applies in wills cases, where the statement *relates to the execution, revocation, identification, or terms of a declarant's will.*"). In the instant case, none of the victim's statements were offered to prove his past conduct; accordingly, we do not need to concern ourselves with the wills exception.

The Appellant contends that "Kristin Rice and Jack James each admitted they had no knowledge of [the victim's] 'state of mind' – the very foundation for admissibility of their testimony – even though [the victim] had never told them whether or not he was depressed." The Appellant does not specify the testimony given by Mr. Rice or Ms. James to which she objects. Regarding Ms. Rice, the Appellant provides citations to the record that generally refer to two pages of Ms. Rice's testimony. In that testimony, Ms. Rice said that the victim did not appear to be in "distress" when he came to her house the Saturday prior to his death to replace some ceiling fans. Ms. Rice said that the victim did not appear to be in pain, sad, withdrawn, or despondent and that he was "kidding around" and a "happy person." The Appellant did not object to this testimony. Accordingly, her objection to this testimony is waived. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Regardless, nothing in the foregoing testimony contains "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Therefore, Ms. Rice offered no hearsay testimony. The Appellant's argument regarding Ms. Rice's testimony is unavailing.

- 24 -

Regarding Mr. James, the Appellant provides general citations to two pages of Mr. James' testimony. In these two pages, Mr. James testified that the victim was adamant that he was not going to Georgia, and Mr. James opined that the victim did not want to leave his mother. Mr. James also testified that in the "weeks and days" leading to the victim's death, he did not notice anything different about the victim's demeanor or personality, that the victim did not seem sad or as if he were withdrawing from people, and that the victim did not appear to be in pain. In fact, Mr. James said that the victim was "funny." The Appellant did not object to this testimony, thereby waiving any objection to this testimony. See Tenn. R. App. P. 36(a). Further, Mr. James' testimony about the victim's not wanting to leave his mother and the victim's demeanor concerned Mr. James' personal observations and were not hearsay statements; therefore, the Appellant's arguments are unavailing. See Tenn. R. Evid. 801. Moreover, given the Appellant's insistence that she wanted to move to Georgia, Mr. James' testimony that the victim refused to move to Georgia was admissible under the state of mind exception to the prohibition against hearsay. See Tenn. R. Evid. 803(3); State v. Jacob Pearman, No. M2015-02271-CCA-R3-CD, 2017 WL 1959120, at *19 (Tenn. Crim. App. at Nashville, May 11, 2017).

The Appellant contends that "Lt. Upton testified that [the victim's] co-workers Marvin Frisbee, Nathan Brown[,] and Nick Ventura said that in their opinions [the victim] was not depressed but each acknowledged he had never asked [the victim] about depression." The citations to the record provided by the Appellant refer to Lieutenant Upton's testimony that he spoke with Mr. Frisbee, Mr. Brown, and Mr. Ventura, each of whom stated that the victim was not depressed. While the opinions of Mr. Frisbee, Mr. Brown, and Mr. Ventura regarding whether the victim was depressed were not hearsay, Lieutenant Upton's testimony regarding the men's statements to him was hearsay. However, the Appellant did not object to this testimony, thereby waiving the issue on appeal.[3] See Tenn. R. App. P. 36(a).

The Appellant contends that Carol Ann Williams should not have been permitted to testify that in a conversation that occurred "more than two years prior to his death," the victim described suicide as the "easy way out" and expressed his belief that anyone who committed suicide was "going to hell." In response, the State contends that the Appellant failed to object to this testimony at trial. In her reply brief, the Appellant argues that the "issue of hearsay evidence from the State's lay witnesses offering inadmissible opinions is

---

[3] We acknowledge that prior to trial, the Appellant filed a "Motion to Suppress And/Or Exclude Testimony" in which he asked the trial court to prevent Lieutenant Upton "from testifying about any hearsay statements pursuant to" Tennessee Rules of Evidence 801 and 802. In the motion, the Appellant specifically listed several statements that were included in Lieutenant Upton's Case Summary Report. The Appellant did not challenge any statements made by the victim's co-workers in the motion. We caution that a pretrial motion seeking to prohibit a witness from testifying to hearsay in general is insufficient to preserve a specific hearsay objection.

raised in more than 200 pages of written pleadings included in the technical record, and hundreds more pages of transcript testimony." As examples, the Appellant cites to 182 pages in the technical record. We caution that without specific citations to the record to support her specific contentions, the Appellant risks waiving her issues. See Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). Ordinarily, this court would not speculate as to what portions of a witness's testimony the Appellant contends is improper absent proper citations to the record. See State v. Dellinger, 79 S.W.3d 458, 495 (Tenn. 2002); State v. Bonds, 502 S.W.3d 118, 144 (Tenn. Crim. App. 2016). However, the general citations provided by the Appellant reveal that the Appellant filed a pretrial motion in limine to exclude any testimony regarding the victim's "opinions and beliefs regarding suicide." We conclude that although this motion did not specifically mention Ms. Williams, the motion was sufficient to preserve the Appellant's objection to Ms. Williams' testimony on this issue.

Whether the victim's death was caused by homicide or suicide was the primary issue at trial. Ms. Williams testified that she and the victim discussed a friend of theirs who had committed suicide. The victim said, "[W]ell, you know where he's at." Ms. Williams responded that she did not know because she "served a loving God." The victim agreed that Ms. Williams might be right. Nevertheless, the victim said, "[I]f you take your life to go the short way out, he felt like that you would be in hell, because he did not believe in suicide." Ms. Williams' testimony concerned whether the victim would intentionally commit suicide; therefore, her testimony was admissible under Rule 803(3).

The Appellant next contends that Scott Cordell was "[s]o disconnected from [the victim's] reality" that he was surprised to learn the victim recently had double knee replacement surgery. Initially, we note that the defense elicited this testimony on cross-examination. The defense did not object to the testimony, thus waiving the issue on appeal. See Tenn. R. App. P. 36(a). Moreover, Mr. Cordell's testimony reflected his overall impression of the victim's health and well-being in the year before the victim's death, and it did not constitute hearsay. See Tenn. R. Evid. 801. Accordingly, the Appellant is not entitled to relief on this issue.

Additionally, the Appellant complains that Lieutenant Upton was allowed to "querulously speculate about someone he had never met while alive" by testifying that no one he spoke with told him the victim was depressed. The Appellant further complains that Lieutenant Upton expressed a personal opinion that the victim was not depressed because he loved playing golf and regularly attended church. Finally, the Appellant complains that Lieutenant Upton testified that the victim had no health problems or reasons to kill himself and that Lieutenant Upton saw no reason to contact the victim's physician's or obtain the victim's medical records. Initially, we note that the Appellant elicited all of the foregoing testimony on cross-examination. Further, the Appellant did not object to any of the foregoing testimony, thereby waiving any issue regarding its introduction. See Tenn.

- 26 -

R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Finally, none of the foregoing statements consisted of hearsay; therefore, the Appellant is not entitled to relief on this issue. See Tenn. R. Evid. 801.

### (b) Tennessee Rule of Evidence 404(b)

The Appellant contends that the trial court "erred when it admitted lay opinion testimony about the state of the Mortons' marriage including factually incorrect and unsubstantiated testimony that the Mortons had financial problems." The Appellant asserts that this testimony violated Tennessee Rule of Evidence 404(b).

Tennessee Rule of Evidence 404(b) provides:

> Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005), State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

- 27 -

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the Appellant's character.

Although the Appellant claims that "[s]everal of the State's lay witnesses cast aspersions on [the Appellant's] character and the state of her marriage to enhance a perception that [the victim's] death was a homicide," the Appellant does not specify what those aspersions were nor does she provide citations to the record to direct this court to where in the nearly 2,000 pages of transcript those aspersions were cast. By failing to support this issue with appropriate references to the record, the Appellant has waived this issue. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

### (c) Right to Confrontation

The Appellant next contends that numerous witnesses testified to statements made by the victim and that Lieutenant Upton testified about the victim's statements and state of mind. The Appellant maintains that these statements "could never be open to cross[-]examination," which essentially made the deceased victim a witness. The Appellant complains that allowing this testimony violated her right to confrontation. The State responds that the Appellant waived this issue by failing to object to the testimony on the basis of a violation of her right to confrontation. We agree with the State.

In Tennessee, criminal defendants are entitled to confront witnesses against them under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. The exercise of the right to confront "is controlled by the trial judge," and "the trial court's decision will be upheld absent an abuse of discretion." State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006) (internal quotation marks and citation omitted).

Our supreme court has explained that "Crawford v. Washington, 541 U.S. 36 (2004), and its progeny are the controlling authority for determining whether the admission of hearsay violates a defendant's rights under the federal confrontation clause, and this Court has applied Crawford to challenges under the Tennessee Constitution, as well." State v. Parker, 350 S.W.3d 883, 898 (Tenn. 2011). In Crawford, the United States Supreme Court drew a distinction between the admission of testimonial and nontestimonial hearsay, explaining that the admission of nontestimonial hearsay is exempt from Confrontation Clause scrutiny but that the "Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination" for the admission of testimonial hearsay. 541 U.S. at 68. However, the Court did not comprehensively define "'testimonial.'" Id.

- 28 -

Subsequently, in <u>Davis v. Washington</u>, 547 U.S. 813, 822 (2006), the Court determined that courts should examine the statement's "primary purpose." Thereafter, the Court provided the following non-exhaustive list of testimonial statements:

> [1] ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and 3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

<u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305, 310 (2009) (internal quotation marks and citation omitted). Our own supreme court has agreed that "'an out-of-court statement is testimonial . . . if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character.'" <u>State v. Dotson</u>, 450 S.W.3d 1, 69 (Tenn. 2014) (quoting <u>Young v. United States</u>, 63 A.3d 1033, 1043-44 (D.C. 2013)).

The Appellant did not object on the basis of a Confrontation Clause violation at trial. Accordingly, the issue is waived. <u>See</u> Tenn. R. App. P. 36(a); <u>State v. Alain Benitez</u>, No. M2021-00073-CCA-R3-CD, 2022 WL 1231075, at *19 (Tenn. Crim. App. at Nashville, Apr. 27, 2022); <u>State v. Dejavone Lee Woods</u>, No. M2020-00114-CCA-R3-CD, 2021 WL 3355498, at *8 (Tenn. Crim. App. at Nashville, Aug. 3, 2021), <u>perm. to appeal denied</u>, (Tenn. Dec. 10, 2021). Nevertheless, as we held, *infra*, the testimony of which the Appellant purportedly complains[4] was not hearsay. Therefore, the Confrontation Clause was not implicated by the testimony. The Appellant is not entitled to relief on this issue.

The Appellant also complains that Lieutenant Upton testified that six people, only one of whom testified at trial,[5] told him they thought the victim was not depressed. The six people were Mr. Morton, Mr. Frisbee, Mr. Brown, Mr. Ventura, Mr. Chris Rice, and Mr. Gary Fox. The Appellant contends that allowing this testimony violated her right to confrontation. Again, we note that the Appellant did not object on this basis at trial. Accordingly, the issue is waived. <u>See</u> Tenn. R. App. P. 36(a).

---

[4] The Appellant provided no citations to the record except to direct this court to "[a]s discussed above" in her brief.

[5] Mr. Morton testified at trial.

**(d) State's Improper Comments**

In a one sentence argument, the Appellant contends that "[b]ecause what attorneys may say in opening is not proof, the trial court also erred in allowing the State's improper comments bolstering the decedent's health in opening and also in the State's presentation of rebuttal proof in its case in chief." The Appellant does not specify to which improper comments the State made during opening argument she is referring, nor does she provide citations to the record to support her contention. This issue is waived. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

**(2) Expert Testimony**

**(a) Limiting Testimony**

The Appellant contends that the trial court improperly excluded expert testimony that the victim's manner of death was suicide. The State responds that the trial court properly exercised its discretion in limiting expert testimony within the bounds of each witness's expertise. We agree with the State.

Generally, expert testimony must be both relevant and reliable before it is admissible. McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997). The trial court has broad discretion in determining the qualifications, admissibility, relevancy, and competency of expert testimony. See State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). This court will not overturn the trial court's ruling on the admissibility of expert testimony absent an abuse of that discretion. See State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).

The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. Rule 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course.'" State v. Murphy, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting State v. Bolin, 922 S.W.2d 870, 874 (Tenn. 1996)). Rule 703 requires that the expert's opinion be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Expert testimony shall be disallowed "if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993), the United States Supreme court held that Federal Rule of Evidence 702 requires that a trial court "ensure that any and all scientific testimony . . . is not only relevant, but reliable." In

- 30 -

<u>McDaniel</u>, our supreme court set forth the following list of factors for determining the reliability of scientific evidence:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by <u>Frye[ v. United States</u>, 293 D.C. Cir. 1923)], the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

<u>McDaniel</u>, 955 S.W.2d at 265. Rules 702 and 703 "together necessarily require a determination as to the scientific validity or reliability of the evidence . . . unless the scientific evidence is valid, it will not substantially assist the trier of fact, nor will its underlying facts and data appear to be trustworthy." <u>Id.</u>

The trial court held extensive pretrial <u>McDaniel</u> hearings. At the hearings, Dr. Valentine testified that he was retired and that prior to his retirement, he was a professor of pediatrics and pharmacology at the University of Arkansas College of Medicine. He also "ran the toxicology service at the Arkansas Children's Hospital." Dr. Valentine testified without objection as an expert in clinical pharmacology and toxicology. Dr. Valentine explained that his "role in this particular case [was] to look at the medications that [the victim] was taking. And from my background and experience in that area to hopefully offer some opinions that would help the Court in deciding what actually happened in this particular incidence." Dr. Valentine noted that in addition to the effects of drugs on the body, he was also able to testify regarding the effects of stopping a drug, which he said in pharmacology was called "discontinuation syndrome."

Dr. Valentine said that he reviewed the victim's pharmacology records from January 2009 until October 28, 2013, which was the last date that the medication was dispensed prior to the victim's death. He also reviewed the various medications that had been prescribed to the victim and recounted the purpose(s) of each. Dr. Valentine said the victim's medical records reflected that he suffered from hypertension. To treat this condition, the victim had been prescribed Nadol, a beta blocker; Amlodipine Besylate, a calcium channel blocker that also helped to prevent strokes; Quinapril, an Ace inhibiter; and Hydrochlorothiazide, a diuretic. The victim had been prescribed Meloxicam and Tramadol, which were both analgesics to alleviate pain. The victim had also been prescribed Acetaminophen-Codeine, a combination analgesic and narcotic, for pain relief. The victim had been prescribed Zolpidem Tartrate, which went by the "trade name" Ambien, for "sleep induction." The victim had been prescribed Metformin, Glyburide, and Januvia to treat his diabetes. The victim had been prescribed Oxaprozin, which could be

used to treat arthritis or as an analgesic. The victim had been prescribed Welchol to treat his high cholesterol. The victim had been prescribed Citalopram, which went by the trade name Celexa, to treat depression. Dr. Valentine asserted that many people the victim's age took medications, that he was not implying "any negative connotation by going through [the victim's] prescriptions," and that each of the victim's prescriptions "had good therapeutic indications from medical records."

Dr. Valentine opined that from his review of the victim's medical records, the victim had stopped taking his blood pressure medications and his diabetes medications. He explained that he formed his opinion based upon the victim's last doctor's visit, during which the victim "was very hypertensive and his blood sugar was up quite high." Dr. Valentine explained that controlling diabetes and blood pressure "has a lot to do with our physiological makeup of what's happening in our kidneys and our pancreas," which are part of the "endocrine system, the endogenous hormone system." Dr. Valentine stated that a person became dependent after taking drugs to control diabetes and blood pressure. Accordingly, upon stopping the medication, the person would "have some hormonal changes," and "the quality of life is not very good at all." Dr. Valentine said that withdrawing the six medications the victim was taking to control his diabetes and blood pressure would have been "a huge change physiologically for the body. And so you would expect that there would be some symptomatology come from that." Dr. Valentine stated that if the victim had not been "feeling good," he would not have been in a good mood, which would have been compounded by stopping his depression medication.

Dr. Valentine noted that the victim's pharmacological records reflected he last filled his prescription for Citalopram on May 21, 2013, for ninety pills, which would have lasted the victim until August. The victim died in November; accordingly, "there's a gap there that he's not taking his medication." Dr. Valentine said that if a person had been using Citalopram regularly then the person ceased taking the drug, the person's depression would "return with a vengeance" after a few days because of "pharmacological rebound." He further said that "[d]epressed patients are at a high risk for suicide" and that if a person stopped taking Citalopram, "one of the discontinuation syndromes is higher risk of suicide."

On cross-examination, Dr. Valentine acknowledged that he was not a medical doctor and that he had been retired since 2008. Dr. Valentine said that the only pharmacy records he reviewed were from Express Scripts Pharmacy, which he agreed could be a "mail order pharmacy that ships prescriptions on a regular basis to patients." Dr. Valentine acknowledged that it was possible the victim had prescriptions filled at other pharmacies of which Dr. Valentine was not aware.

Dr. Valentine conceded that males of the victim's age were sometimes given testosterone to treat depression. Dr. Valentine further conceded that the victim was

receiving testosterone injections at his doctor's office and that "he received those injections faithfully until right up until a few days before he died." However, Dr. Valentine asserted that testosterone was not an anti-depressant.

Dr. Valentine said that it was not possible to simply look at an individual and diagnose whether the person was depressed. Instead, the diagnosis was left to general practitioners, psychiatrists, or psychologists. Dr. Valentine acknowledged that he would not be qualified to examine the victim and diagnose if he were suffering from depression because "that's not my field of expertise." Dr. Valentine agreed that his belief that the victim was suffering from depression prior to his death was "based solely on my belief that [the victim] was not taking his medication as prescribed." Dr. Valentine further agreed that his belief that the victim was not taking his blood pressure and diabetes medication was because his blood pressure and blood sugar were elevated during his last doctor's visit. Dr. Valentine acknowledged, however, that factors other than stopping medication could have affected the victim's blood pressure and blood sugar. Dr. Valentine agreed that the toxicology screening performed on the victim's blood after his autopsy did not address whether the victim was taking his medication as prescribed.

Dr. Valentine acknowledged that if the victim's medical records reflected that on February 15, 2013, the victim's blood pressure was "175 over 102"; that on April 12, 2013, the victim's blood pressure was "155 over 88"; that on June 14, 2013, the victim's blood pressure was "126 over 80"; and on September 27, 2013, his blood pressure was "140 over 90," then it demonstrated that the victim's blood pressure was under "a little bit better control" during the last two doctor's visits.

Dr. Carl S. Orthoefer testified that he was a general internal medical doctor who specialized in the care of hospitalized patients. He reviewed the victim's medical records, pharmacy records, and autopsy records and learned that the victim had "fairly extensive" medical conditions such as diabetes, hypertension, obstructive sleep apnea, a history of kidney stones, osteoarthritis, issues with chronic pain, and depression. From the autopsy, Dr. Orthoefer learned that the victim's heart was enlarged, that his kidneys were scarred, that he had evidence of peripheral vascular disease, that he had some abnormalities in his adrenal glands, and that he was morbidly obese. Dr. Orthoefer opined that as a result of these conditions, the victim would have felt tired and would have had low energy. Dr. Orthoefer said that Cushing's disease, which he refused to state the victim had, was "a classic excess of steroid in the body that's generated by dysregulation of the adrenal glands" that puts patients at risk of depression and psychosis. He opined that people who dealt with increased cortisol secretion and depression were at a higher risk of suicide. Dr. Orthoefer surmised that the victim "may have had a cortisol excess." However, no "tests were done regarding increase[d] cortisol release," and Dr. Orthoefer did not know of a post-mortem test that would confirm a diagnosis of Cushing's disease.

- 33 -

Dr. Orthoefer said that people with sleep apnea have non-restorative sleep, which could "add to depression." Dr. Orthoefer stated that people with depression had an increased risk of suicide.

Dr. Orthoefer said that the victim's prescriptions were not "abnormal" in light of his medical conditions. However, he noted that based upon the victim's pharmacy records and the number of pills left in the victim's pill bottles, "it appeared as though [the victim] was not taking his medications as prescribed." Dr. Orthoefer noted that if someone taking four different medications for blood pressure stopped taking his medication, the person would be at "significant risk of stroke, heart attack, [and] kidney failure." Ceasing diabetes medication would cause hyperglycemia, which would put the person at increased risk of renal failure, stroke, and heart attack. Stopping both blood pressure and diabetes medication would cause a person to "feel bad," and it could "exacerbate the condition of depression."

On cross-examination, Dr. Orthoefer said that as an internist, he was able to address health problems. Dr. Orthoefer said that he did not know where the counting of the victim's pills took place or who had possession of the pill bottles prior to the "pill count." Dr. Orthoefer said that he did not "think [it was] knowable" whether the victim had consistently taken his medication from January 2, 2009, until his death. Dr. Orthoefer acknowledged that Cushing's disease was a "very rare" disorder. Dr. Orthoefer reiterated that he was "not saying that [the victim] ha[d] Cushing's disease."

When asked if any data supported a connection between physical problems and a propensity for suicide, Dr. Orthoefer responded, "I think logic would dictate that a person who is depressed and has a multitude of medical conditions that are not under control[], is at risk of suicide."

Dr. James Sidney Alexander testified that he was a psychiatrist. Dr. Alexander said that the concept of psychiatric autopsy had been around before 1980. He performed a psychiatric autopsy after reviewing the victim's medical records, ballistics information, pharmacy records, and the medical examiner's information; speaking with Pastor Micah Nicolaus, Jack James, and Allison Morton; and reading the statements of April Anderson and Teddy Bivens. He concluded that the Appellant did not kill the victim but that the victim "tragically committed suicide."

Dr. Alexander noted that the victim had high blood pressure, that he was on four different blood pressure medications, and that the victim "wasn't always compliant with his medication." Based upon the autopsy, Dr. Alexander believed that the victim had increased cortisol production, which would have led to an increased risk of suicide. Dr. Alexander said that the victim had cardiomyopathy, which was "over muscularizing of the

heart," and that it caused his arteries to get smaller and increased his blood pressure. Dr. Alexander conceded that "most people that have high blood pressure are not depressed."

Dr. Alexander said that the victim had been diagnosed with depression and "very severe" obstructive sleep apnea. Dr. Alexander said those conditions "set him up for potentially having encephalopathy." Dr. Alexander was "certain that [the victim] suffered low level encephalopathy that caused ever increasing brain damage due to severe untreated unobstructed sleep apnea." Dr. Alexander explained that "enceph means brain and opathy or pathology means that there's something medically wrong." Dr. Alexander noted that the victim had double knee replacement surgery and that "patients frequently have periods of encephalopathy after the surgery" due to an excess inflammatory response.

Dr. Alexander said that "acute pain, as well as chronic pain, can cause delirium or encephalopathy or be part of a multisystem reason as to why somebody might get delirious." Additionally, chronic pain could lead to depression and decreased cognitive functioning. Dr. Alexander said that the victim had been diagnosed with depression, which put him at higher risk of suicide. The victim's friends thought the victim was "his normal self." Dr. Alexander opined that the victim would have "put on a happy face" and "maintain[ed] the best he could until the end." However, Dr. Alexander learned from the Appellant and Allison Morton that after the victim's double knee replacement, he slept on the couch until he "could muster enough strength to go to church and do things and be pleasant and come back and to sleep. . . . But that his existence for the last year to year and half was laying on the couch." Dr. Alexander acknowledged that "[n]obody," not even psychiatrists, were good at predicting suicide.

Dr. Alexander said that he had previously testified once regarding a forensic autopsy in a criminal case and once in a civil case. When asked where to find a standardized procedure for conducting a forensic psychiatric autopsy, Dr. Alexander responded:

> One of the places to go is the American Psychiatric Association. And what I did in the [prior criminal] case and repeated in this case was use the criteria from the A.P.A. that is used when assessing someone for the risk of suicide using both the factors that would – that might implicate it was a suicide then protective factors.
>
> . . . I can't go to the A.P.A. and find guidelines on how to do a psychiatric autopsy. There are guidelines through the American Psychological Association. They've been doing psychological autopsies longer than the psychiatrists have.

At that point, the following colloquy occurred:

[The State:] You started out by saying the American Psychiatry Association was a good place to look. But then did I hear you say that they don't have standardized guidelines in the American Psychiatric Association?

[Dr. Alexander:] Correct.

[The State:] But they do in the American Psychological Association?

[Dr. Alexander:] They – what I'm saying is they are a better source to look because they have been doing it longer and in my search for preparing for this trial I have found information there.

. . . .

[The State:] . . . [W]hat do you find in the A.P.A., American Psychological Association, that you've just alluded to for having sources for standardized procedures here, what do you find there that guides you in conducting a standardized forensic psychological autopsy?

[Dr. Alexander:] Well I've got several articles.

The State asked Dr. Alexander to define the standardized steps to be taken in conducting a forensic psychological autopsy. Dr. Alexander responded that "I don't have those in front of me." He stated:

it is not an easy topic to find because the American Psychiatric Association does not have a section that says these are the guidelines for doing a psychiatric autopsy. Then I go to the next best thing which is a psychological autopsy. And I have read numerous articles, many before the last few days.

Dr. Alexander said "there's not a lot of difference between doing a psychiatric autopsy on someone and doing an evaluation of someone." Dr. Alexander could not define the steps to be performed during a psychiatric autopsy. Dr. Alexander acknowledged that "for the most part," there was a "lack of standardized protocol" with psychiatric autopsies and that the "current state is under construction." He stated, "Well if there's not a standard that's been achieved yet, then – and I couldn't find one to bring here with me, then we are

doing the best we can without having that standardization." Dr. Alexander said that the best information on how to conduct a psychological autopsy was an article on the assessment of suicidal behavior and evaluating the risk of suicidal behavior that came from the American Psychiatric Association. When asked if the article concerned evaluating suicide risks instead of conducting a forensic psychological autopsy, Dr. Alexander responded, "Right, because that does not exist in the kind of terms that you are talking about."

Although the Appellant contends that the trial court excluded the testimony of the experts, the trial court's order reflects that the court merely limited the experts' testimony. Regarding Dr. Valentine, the trial court found that

> Dr. Valentine admitted on cross-examination that he is not a medical doctor and that he would not be qualified to examine [the victim], if he were alive, and diagnose him with depression. The court finds that if Dr. Valentine is not qualified to diagnose a person who is alive with depression, he is certainly not qualified to diagnose someone with depression postmortem. Accordingly, the court will exclude Dr. Valentine's opinion that [the victim] was suffering from depression for 6-8 weeks prior to his death in November of 2013.

The trial court noted that although the defense presented sufficient proof that the victim had not taken his medication as prescribed for several years, the defense presented insufficient proof that the victim had stopped taking his medications, specifically Citalopram. In particular, the trial court noted that the victim's blood was never tested for Citalopram. Accordingly, the trial court held that any testimony implying that the victim stopped taking Citalopram was "clearly speculative" and that it was, therefore, inadmissible. We conclude that the trial court did not abuse its discretion in limiting Dr. Valentine's testimony.

The trial court found "Dr. Orthoefer to be qualified [as an expert], his testimony to be relevant and reliable, and that he can assist the trier of fact in their understanding of the various medical conditions [the victim] was suffering from at the time of his death." Nevertheless, the court expressed concerns about Dr. Orthoefer's testimony regarding his opinion that the victim was at increased risk for suicide due to his depression and other medical issues. The court stated that the testimony was speculative considering that no tests were conducted regarding whether the victim had excess cortisol levels or whether the victim suffered from Cushing's disease, and no medical records supported the diagnoses. We conclude that the trial court did not abuse its discretion in limiting Dr. Orthoefer's testimony.

The trial court found that Dr. Alexander was qualified as an expert, that his testimony was relevant and reliable, and that based upon his psychiatric knowledge and experience, he could assist the trier of fact in understanding the typical characteristics or profiles of suicidal persons. Nevertheless, the trial court noted that Dr. Alexander "appeared to rely more heavily on the information provided by the collateral sources who supported his opinion that [the victim] was at an increased [risk] for suicide, such as the [Appellant], and appeared to discount the information from collateral sources who did not." The trial court found that Dr. Alexander agreed that no standardized protocol or methodology for conducting a psychiatric autopsy existed and that the process was not filled with certainty. Further, Dr. Alexander could not provide any potential rate of error in conducting a psychiatric autopsy and was unable to say that he conducted any research in the area independent of litigation. Therefore, the trial court held that Dr. Alexander's opinion that the Appellant did not kill the victim but that the victim committed suicide was not admissible pursuant to <u>Daubert</u> or <u>McDaniel</u>. We note that the Appellant chose not call Dr. Alexander as a witness during trial. We conclude that the trial court did not abuse its discretion in limiting Dr. Alexander's testimony. The Appellant is not entitled to relief on this issue.

### (b) Right to Present a Defense

The Appellant also claims that the trial court's limitations on expert testimony deprived her of her right to present a defense. The State responds that the trial court properly limited the expert testimony and that the Appellant was able to present a defense theory that the victim had committed suicide through the available testimony.

The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution guarantee a criminal defendant the right to present a defense. <u>State v. Brown</u>, 29 S.W.3d 427, 432 (Tenn. 2000). However, in many situations, the appellant's due process right "'must yield to other legitimate interests in the criminal trial process.'" <u>Id.</u> at 432 (quoting <u>Chambers v. Mississippi</u>, 410 U.S. 284, 295 (1973)). To this end, "[s]o long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." <u>State v. Flood</u>, 219 S.W.3d 307, 316 (Tenn. 2007). To determine whether a defendant's due process right to present a defense has been violated by the exclusion of evidence, we must consider:

> (1) Whether the excluded evidence is critical to the defense;
> (2) Whether the evidence bears sufficient indicia of reliability; and
> (3) Whether the interest supporting exclusion of the evidence
> is substantially important.

Id. at 316 (citing Brown, 29 S.W.3d at 434-35; State v. Rice, 184 S.W.3d 646, 673 (Tenn. 2006); State v. Rogers, 188 S.W.3d 593, 614 (Tenn. 2006)).

Here, the trial court limited the testimony of Dr. Valentine and Dr. Orthoefer because the proffered testimony that the victim was suicidal at the time of his death was too speculative. The trial court limited Dr. Alexander's testimony because the proffered testimony that the victim's manner of death was suicide was based upon expert testimony that did not meet the standards of McDaniel and, therefore, could not assist the jury in its determination of the issues at hand. The trial court permitted expert testimony concerning the effects of the victim's medications, the victim's overall health, and generalized suicide risk factors as they might have related to the victim. The Appellant, for reasons not found in the record, did not present Dr. Alexander as a witness at trial. That said, the Appellant was still permitted to fully present a theory that the manner of death in this case was suicide. We conclude that the Appellant's right to present a defense was not infringed by the trial court's limitation on expert testimony.

## C. **Ferguson** Jury Instruction

The Appellant contends that the trial court erred by failing to give an instruction to the jury based upon the State's failure to preserve potentially exculpatory evidence as mandated by State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999). Specifically, the Appellant asserts that the trial court should have instructed the jury regarding the State's (1) failure to preserve GSR evidence at the victim's autopsy, (2) failure to preserve the patrol cars' audio-video recordings from the scene, and (3) failure to preserve the victim's anti-depressant medication bottles. The State argues that the trial court did not err by refusing to give the instruction regarding the audio-video recordings or GSR evidence gathered at the autopsy because the Appellant failed to establish that the audio-video recordings ever existed, and the Appellant failed to establish that the "body bag" and the bags on the victim's hands contained "potentially exculpatory" GSR evidence. The State further contends that the Appellant failed to request a jury instruction regarding preservation of the victim's anti-depressant medication bottles, and, in any event, the medication bottles were not lost or destroyed because they were retained by the Appellant and admitted at trial as stipulated by the parties.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). Thus, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87 (1963).

In Ferguson, our supreme court addressed "the factors [that] should guide the determination of the consequences that flow from the State's loss or destruction of evidence which the accused contends would be exculpatory." Ferguson, 2 S.W.3d at 914. The court explained that a reviewing court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Id. at 917. "For this duty to arise, the [evidence] must be expected to play a significant role in [the Appellant's] defense." State v. Merriman, 410 S.W.3d 779, 792 (Tenn. 2013). "Specifically, [the evidence] must have potential exculpatory value and be of such a nature that [the Appellant] would be unable to obtain comparable evidence by other reasonably available means." Id. "If the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty, the analysis moves to a consideration of several factors which should guide the decision regarding the consequences of the breach." Ferguson, 2 S.W.3d at 917. The factors include:

> 1. The degree of negligence involved;
> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
> 3. The sufficiency of the other evidence used at trial to support the conviction.

Id. (footnote omitted). If the court's consideration of these factors reveals that a trial without the missing evidence would lack fundamental fairness, the court may consider several options such as dismissing the charges or providing an appropriate jury instruction. Id. We will review a trial court's decision concerning the fundamental fairness of the trial under a de novo standard. Id. at 790. In the event we determine the trial would be fundamentally unfair in the absence of the lost evidence, we will review the remedy applied by the trial court under an abuse of discretion standard. Id. at 791-92.

### (1) GSR Evidence from Victim

On January 25, 2016, the Appellant filed a motion to dismiss the indictment, alleging that the State failed to preserve the brown paper bags that were placed over the victim's hands. The Appellant later added the additional Ferguson claim that the State failed to preserve the body bag in which the victim was transported to the medical examiner's office. The Appellant alleged that potentially exculpatory GSR evidence had been destroyed with the disposal of the brown paper bags and the body bag following the victim's autopsy. In its written response, the State contended that the best evidence of the presence of GSR on the victim would be the swabs taken for testing, which were preserved and subjected to independent examination by the Appellant.

Although the Appellant initially requested an evidentiary hearing be held concerning the GSR motions, the parties ultimately agreed to submit the motions for the trial court's determination based upon the arguments presented in the Appellant's written motions and the State's response. Through their pleadings, the parties agreed that the victim had been placed in a body bag and transported to the hospital, that first responders placed brown paper bags on the victim's hands, that the brown paper bags were removed during the autopsy later that day, and that the brown paper bags and body bag were discarded during the autopsy. The parties disagreed that testing of the brown paper bags and body bag would have produced potentially exculpatory evidence.

On January 19, 2017, the trial court entered an order denying the Appellant's motion to dismiss based upon allegations concerning the brown paper bags and the body bag. The trial court found that the victim's body was transported to the hospital inside a body bag. Brown paper bags were placed on the victim's hands at the hospital. Afterward, the victim's body was taken to the medical examiner's office for an autopsy, during which the body bag and brown paper bags covering the victim's hands were discarded.

The trial court further found that

> [t]he [Appellant's] reliance on Ferguson is misplaced. Ferguson applies to the loss or destruction of evidence. The court finds that there was no sufficient proof before the court that those items, which were used as tools to transport and preserve evidence, were in fact evidence or contained any potentially exculpatory evidence. Therefore, the State did not have a duty to preserve these items.

Based upon these findings, the trial court denied the Appellant's motion to dismiss.

On January 30, 2017, the Appellant filed a request for a Ferguson curative instruction concerning the brown paper bags and the body bag. The trial court reaffirmed its previous ruling on the motion to dismiss and denied the Appellant's special jury instruction request.

At the outset, we observe that the Appellant did not present any evidence in support of her pretrial Ferguson motions and, instead relied upon the averments and arguments presented in the pleadings. That said, at trial Special Agent Davis testified that the presence of GSR indicated only that "someone fired, handled, or was near a gun when it was fired, or perhaps came in contact with something that had gunshot residue on it." He stated that the absence or presence of GSR would not indicate who fired a weapon. In reference to a gunshot wound victim, he said,

I would expect them to have gunshot primer reside if they were shot . . . . So we typically will not run materials that come from someone who has been shot because we already know they are associated with a fired weapon because they have a bullet wound.

Thus, the testimony at trial established that neither the presence nor the absence of GSR could definitively rule out homicide or suicide as the manner of death. The Appellant failed to establish that any potentially exculpatory evidence was lost or destroyed by the disposal of the brown paper bags and the body bag. None of the purported evidence would have "play[ed] a significant role in [the Appellant's] defense." Merriman, 410 at 792. Accordingly, we conclude that the Appellant was not entitled to a Ferguson instruction regarding the brown paper bags or the body bag.

### (2) Audio-Video Recordings

On October 7, 2015, almost two years after the victim's death, the Appellant filed a specific motion for discovery seeking audio-video recordings taken from the patrol cars at the scene on November 6, 2013. On January 15, 2016, the Appellant filed her first motion to dismiss the charge, alleging that the State failed to preserve the audio-video recordings in violation of Ferguson. The trial court held several pretrial hearings concerning this Ferguson allegation wherein the State maintained that no audio-video recordings had existed to be preserved.

At the first hearing on January 29, 2016, the State maintained that the Appellant should not be permitted to present testimony concerning the audio-video recordings because "there are no audio recordings. No audio recordings, no video recordings, there are no recordings." In support of this argument, the State presented the affidavit of Lieutenant Upton stating that he "confirm[ed] there is no audio or video [recordings] from the Morton scene and none ever existed." The State asserted that "Ferguson doesn't apply because that evidence never existed." The Appellant asserted that her investigation revealed circumstantial evidence that recordings had been made and that they contained "potentially exculpatory evidence." The court denied the motion to dismiss, finding that the Appellant could not establish that any recordings existed that were destroyed by the State, and, absent such proof, Ferguson did not apply. Upon further argument, however, the trial court permitted the Appellant to proffer testimony concerning the existence of the audio-video recordings and the potentially exculpatory evidence contained on them.

Chasey Hachmann and Paul Roberts both testified that they were neighbors of the Mortons. Ms. Hachmann stated that she was awakened by sirens in the early morning hours of November 6, 2013. Upon looking outside, she observed several patrol cars with their blue lights activated in front of the Morton home. Ms. Hachmann stated that one

patrol car was located "right before you turn into [the Morton's] driveway" and that another patrol car "was directly behind" the first one. Mr. Roberts recalled seeing "two patrol cars" located "on the side of the road where the Morton's live." He said that he "saw the lights" as he was going outside for the newspaper. Courtney Bryson, an emergency first responder, testified that she arrived to see "[b]etween two and three" patrol cars with their blue lights activated.

Deputy Ketner testified that he was called to the scene on November 6, 2013, and that he arrived with his siren and blue lights activated. He said that his patrol car's camera was working properly that day but that he was not wearing a body camera at that time. He stated that the audio-video recording device was activated whenever the lights were activated. He further recalled that the "in-cruiser camera" was activated whenever he transported someone in the patrol car. He acknowledged transporting Mr. Morton to the LCSO for an interview later that morning, but he denied having any conversations with Mr. Morton while driving to the LCSO. Deputy Ketner said that patrol officers are also equipped with a body microphone that will make audio recordings. He said that he did not collect any evidence at the scene and did not have any conversations with other officers about the collection of evidence.

Deputy Ketner further explained that patrol deputies download their audio and video recordings to a server at the LCSO. He said that he would have, as normal LCSO protocol, downloaded the data from his patrol car to the server. He also said, however, that he never watched a recording related to his call to the scene that day and that he had no knowledge whether there were any technical problems with any downloads around the time of the victim's death. In summary, Deputy Ketner said, "The only thing that I know is when I activate my lights and sirens, the video and audio picks up. I go down to the jail and download it, and that's it. That's as far as I know."

Deputy Ketner acknowledged that he "was not wearing [his] body mic" on November 6, 2013. He also affirmed that he had no "personal knowledge" that any recordings were made and downloaded to the server. He said that he never reviewed any audio or video recordings from that day. He also stated that he was "not aware" if the backseats of the patrol cars contained audio microphones.

At the conclusion of Deputy Ketner's testimony, the trial court remarked that

> what we need is somebody that will come in here and tell us yes, when this officer downloaded material, there was something actually on it, it went into the system . . . somebody saw it and said yes, that was a good video, it was a bad video, good audio, bad audio

- 43 -

in order to establish the existence of the evidence as a prerequisite to determining that the State was required, but failed, to preserve the recordings. The Appellant then presented the testimony of Captain Tony Arden.

Captain Arden testified that his duties as Administrative Captain for the LCSO included downloading recordings from the main server upon request. In describing the process, he said, "The cars capture the video, they come back to the building, they plug up to a port in the wall, it downloads to the server, and then it's on my computer at that time." Captain Arden stated that he did not know who was present at the scene and did not know if anyone downloaded any recordings. He further explained that any downloaded material was automatically overridden from the server after approximately sixty-five days, unless a recording was requested and "flagged" for preservation by the lead investigator on the case. The lead investigator in this case was Lieutenant Upton, who did not request that Captain Arden "flag" any recordings from the November 6, 2013 scene.

Sergeant Bowen testified that he arrived at the scene of the victim's death with his patrol car's blue lights and siren activated, and he left his patrol car running while he was inside the Mortons' home. He stated that he downloaded material from his vehicle's computer to the main server. He did not know if any audio-video recordings were made from the scene, but he also acknowledged that he was not aware of any technical problems with the recording equipment. Sergeant Bowen testified that he did not question any witnesses at the scene and that, upon his initial arrival, he "called for investigators and they took over the scene." On cross-examination, Sergeant Bowen stated that he never reviewed any recordings from this case.

At this point in the hearing, the State argued that the Appellant had failed to establish that any recordings had been made or, in fact, existed. The trial court commented:

> I think we have to first establish that there was either video or audio . . . . Then we have to establish whether or not it's exculpatory. Whether or not the [Appellant] could have gotten it anywhere else other than from the [S]tate.
>
> I haven't heard whether or not there was even a tape or the audio. They testified that they wore the mics, they wore the – or had the cameras on their car, wore their mics, and they downloaded something according to procedures.
>
> Nobody has said whatever they downloaded captured anything.
>
> . . . .

- 44 -

> Because otherwise it would just be the mere possibility
> of exculpatory evidence . . . [and] that's not enough.

The trial court then permitted the Appellant to present the testimony of Lieutenant Upton.

Lieutenant Upton testified that he was in charge of supervising the investigation and collecting information in this case. He stated that even though the victim's death was reported as a suicide, "[w]e work it as a homicide till it's proven different." As the lead investigator, Lieutenant Upton was responsible for flagging any audio-video recordings, saying, "[I]f there is any video flagged[,] I'll be the one to flag it." When asked if he reviewed any recordings, Lieutenant Upton stated that there were no recordings. He also stated that the officers were not equipped with body cameras at the time of the victim's death.

At the conclusion of the proffered testimony, the trial court once again denied the motion to dismiss, finding that the Appellant had failed to establish that the audio-video recordings existed. The trial court continued the proffer for a further hearing. However, on February 1, 2016, the trial court entered a written order setting aside its oral rulings denying the Appellant's motion to dismiss pending a further hearing.

On January 9, 2017, the trial court held a further hearing on the audio-video recordings related to the Ferguson motion. Lieutenant Upton testified that he was asked to prepare an affidavit concerning the existence of any audio-video recordings. Lieutenant Upton testified that he "never saw any audio or heard any audio video on this case." He conceded that his affidavit affirmed that "none ever existed." He explained that "none existed. I asked for the video after the motion was filed. Looked for the video and none was found. I checked with Captain Arden and other officers and there was no video." Lieutenant Upton could not recall when he checked for the recording and did not know if it occurred more than sixty-five days after November 6, 2013. He admitted that he did not know whether the recording technology was working properly at the scene. He reiterated, "I have no video or audio in my case file." He admitted that he "did not ever flag the video [in this case] for preservation." Lieutenant Upton further explained that he did not flag any patrol car recordings because "none of the officers interviewed any of the witnesses there."

Captain Arden testified that he was responsible for "flagging" recordings upon request of the lead investigator. He was unsure whether an officer generally received an error message if a problem with downloading to the server occurred. He did say, however, that neither Deputy Ketner, Sergeant Bowen, nor Corporal Brown reported any issues with downloading to the server around the time of the victim's death.

At the conclusion of the proof and arguments of the parties, the trial court ruled from the bench. The trial court found that

> there's been no proof presented at either our last hearing . . . [or at] the continuation of that today that any video or audio recording ever existed from the officer[s'] patrol cars that responded to the Morton residence in November 2013. No one ever viewed those videos, if they ever existed and no one ever checked to see if they ever existed. And there has been no proof that even if the video or audio recordings did exist that they contained any potential exculpatory evidence. It would be merely speculation that if they did exist that they contained any potential exculpatory evidence. . . . [T]here was no video inside the home.
>
> There could have been a possibility of audio inside the home, but there was testimony that they weren't sure it would pick up inside the structure so again we don't know if they ever existed. And if the video did exist whether or not they picked up anything at all.
>
> And whether or not the audio recordings if they did exist, whether or not they picked up anything that could be potentially exculpatory for the [Appellant].
>
> . . . Lieutenant Upton testified that he did not flag them for preservation because none of the officer[s] interviewed anyone at the Morton home.
>
> And there was no testimony from Lieutenant Upton that these videos or audios, if they did exist, would be useful at the trial.
>
> And if these video[] or audio[] recordings did exist and they were taped over due to a lapse of time . . . any negligence on [the] part of the Loudon County Sheriff's Department would be simple negligence.
>
> And the court concludes that the [Appellant] will be able to receive a fair trial without these videos or audios if they did exist.

So the motion to dismiss [and request for a curative instruction] is denied.

Thus, the trial court found that the defense had failed to establish that the audio-video recordings did, in fact exist, to trigger the protections set out in Ferguson and require the trial court to instruct the jury concerning the State's duty to preserve evidence. The trial court further found that the Appellant had failed to establish that any audio-video recordings, if they had been made, held exculpatory value. Therefore, the trial court ruled that the State did not have a duty to preserve the items and that a special jury instruction was not warranted.[6]

We agree with the trial court that the Appellant failed to establish a duty to preserve the alleged evidence in this case. At the pretrial hearings, the Appellant failed to establish that any recordings did, in fact, exist. "[T]his court has repeatedly refused to grant Ferguson relief when there was no proof that the alleged evidence existed." State v. Randall S. Sparks, No. M2005-02436-CCA-R3-CD, 2006 WL 2242236, at*5 (Tenn. Crim. App. Aug. 4, 2006). Assuming arguendo that the recordings did exist, the Appellant failed to establish that the recordings contained any potentially exculpatory information. Deputy Ketner, the first officer on the scene, was not wearing his body microphone on November 6, 2013. The distance from the patrol cars to the interior of the home would have hampered consistent and clear audio recordings. Moreover, the patrol officers were not tasked with interviewing witnesses at the scene. Nothing happened within view of the patrol cars' video recording range. The 911 recording and recording of the Appellant's statement to investigators were preserved. The Appellant has failed to articulate that any evidence from the audio-video recordings, had they existed, would have "play[ed] a significant role in [the Appellant's] defense." Merriman, 410 at 792. Accordingly, we conclude that the Appellant was not entitled to a Ferguson jury instruction regarding the audio-video recordings.

### (3) Anti-Depressant Medication Bottles

We note that although the Appellant contends that a Ferguson instruction was warranted due to the State's failure to preserve the victim's anti-depressant medication bottles, the Appellant failed to raise a Ferguson issue pretrial concerning the preservation of the medication bottles. Tenn. R. App. P. 36(a). Furthermore, the victim's prescription bottles were retained by the Appellant and stipulated by the parties for use at trial. See State v. Lawrence Warren Pierce, No. M2003-01924-CCA-R3-CD, 2004 WL 2533794, at *10 (Tenn. Crim. App. at Nashville, Nov. 9, 2004) (stating that "the State had no duty to

---

[6] On March 3, 2017, the Appellant filed a written motion requesting the Ferguson jury instruction concerning the audio-video recordings in order to adequately preserve the issue for appellate review, having only requested the instruction orally prior to the hearing.

preserve the name of the witness because the defendant himself had possession of the evidence, namely, the woman's business card. Thus, the State had no duty to disclose the evidence and, therefore, no duty to preserve it."). A <u>Ferguson</u> instruction, had it been requested, was not warranted as it relates to the anti-depressant medication bottles.

### D. Prosecutorial Misconduct

The Appellant contends that "the trial court tolerated prosecutorial misconduct that prejudiced the [Appellant] by denying her a fair trial and affecting the jury and its conclusions." Specifically, the Appellant names five areas that she alleges amount to prosecutorial misconduct: (1) the State elicited or failed to correct false and misleading testimony from Lieutenant Upton, (2) the State failed to correct false sworn statements in support of applications for search warrants, (3) the State repeatedly made "abusive objections," (4) the State "engaged in a series of obstreperous objections" to portray Appellant's counsel as acting improperly, and (5) the State accused the Appellant of improperly disposing of the living room couch. The State responds that the prosecutors did not engage in misconduct and that the Appellant's allegation "is no more than a rebranding of other failing legal claims into an ad hominin attack on the prosecutors."

"[P]rosecutorial misconduct does not amount to reversible error absent a showing that it has affected the outcome of the case to the prejudice of the defendant." <u>State v. Reid</u>, 164 S.W.3d 286, 321 (Tenn. 2005); <u>see also</u> <u>Harrington v. State</u>, 385 S.W.2d 758, 759 (Tenn. 1965); <u>State v. Gray</u>, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). In making this determination, this court is guided by five factors:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
> 2. The curative measures undertaken by the court and the prosecution.
> 3. The intent of the prosecutor in making the improper statement.
> 4. The cumulative effect of the improper conduct and any other errors in the record.
> 5. The relative strength or weakness of the case.

<u>Judge v. State</u>, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); <u>see also</u> <u>State v. Buck</u>, 670 S.W.2d 600, 609 (Tenn. 1984).

### (1) Lieutenant Upton's Testimony

The Appellant contends that prosecutors elicited false testimony from Lieutenant Upton when Lieutenant Upton mischaracterized the location of the victim's bullet wound

- 48 -

as being located "behind his left ear" and "engaged in a subterfuge to obfuscate the existence of audio and visual recordings."  The State argues that the objectionable testimony cited by the Appellant was actually elicited by Appellant's counsel during cross-examination.  Further, the State argues that the allegation concerning the audio-video recordings is merely an attempt to relitigate the Ferguson claim concerning the recordings.  We agree with the State.

### (a) False Testimony

The Appellant contends that Lieutenant Upton's "testimony was replete with inconsistency and obfuscations of truth."  She maintains that Lieutenant Upton "falsely swore the autopsy report indicated the fatal bullet entered" the victim's head behind his left ear when the bullet in fact had entered near the victim's temple above his left ear.  The Appellant further maintains that Lieutenant Upton "told **many** different stories about bullet entry location."

We note that our review of the citations provided by the Appellant reflects that the contested testimony was elicited during the Appellant's cross-examination of Lieutenant Upton.  The Appellant began by asking Lieutenant Upton to "familiarize" himself with the search warrant and accompanying affidavit.  After doing so, Lieutenant Upton agreed that the bullet entered behind the victim's left "ear, the angle and entry would have been difficult for [the victim] to perform – perform that himself."  When the Appellant challenged Lieutenant Upton regarding whether the bullet entered behind the victim's ear, Lieutenant Upton stated that the bullet "entered in the area of his ear."  Upon being pressed further by the Appellant, Lieutenant Upton clarified:

> When I made the application for the search warrant, the understanding that we had was the bullet was near the ear.  It does say that it was behind the left side, behind the ear, and the photo[s[7]] not show[ing] that it's behind the ear, it's like even with it on top, yes.
>
> . . . .
>
> The photo shows that, after he was cleaned up and everything, that the bullet wound is like on top of his ear, like, it's hard to explain, like it's not necessarily behind it or [in] front, but kind of equal with it on the top, near the top of his head.

---

[7]The Appellant showed Lieutenant Upton a photograph of the bullet wound that was taken during the victim's autopsy.

- 49 -

As support for her claim that Lieutenant Upton's testimony was untruthful, the Appellant gives a citation to Detective Cosner's testimony where he agreed on cross-examination that a photograph of the bullet wound which was taken during the victim's autopsy showed that the wound "appears to be in front of his ear[, . . .] not behind his ear."

We conclude that if anything, the Appellant's confronting Lieutenant Upton with the discrepancies in his description of the placement of the bullet wound might have weakened his credibility before the jury. In any event, because this testimony was elicited by the Appellant, this allegation cannot support a claim of prosecutorial misconduct. Tenn. R. App. P. 36(a).

### (b) Audio-Video Recordings

Turning to the allegation concerning the existence of the audio-video recordings, we note that Lieutenant Upton testified extensively on that subject at trial. He explained that he did not flag any recordings for preservation because only patrol officers were equipped with body microphones, patrol officers did not question witnesses at the scene, and, even if questioning had occurred, the microphones would not have consistently recorded anything given the distance from the patrol cars to the interior of the home. He admitted that he never reviewed any recordings and, therefore, did not flag any recordings because he did not expect them to contain any relevant information. When confronted on cross-examination with his pretrial affidavit stating that "none existed," he explained that by the time the Appellant's Ferguson motion was filed, no recordings existed. We agree with the State that this allegation is an attempt to relitigate the Appellant's Ferguson claim under the lens of a prosecutorial misconduct allegation. The trial court ruled that the Appellant had failed to establish that any audio-video recordings existed. We have affirmed the trial court's ruling. The Appellant cannot establish prosecutorial misconduct through this claim.

### (2) Statements Made in Applications for Search Warrants

The Appellant asserts that "[a]ll of the Applications in support of Search Warrants contained fictitious facts." The Appellant maintains that a search warrant was issued for her house and its contents and that another warrant was issued for her cellular telephone records. The Appellant complains that both applications for a search warrant stated that: (1) "[t]here was a small amount of blood on [the victim's] left hand which was inconsistent with suicide," (2) "[the Appellant's] demeanor and statements were not consistent with the crime scene," (3) "[f]ound in the initial search was a download of [the victim's] Norfolk Southern Railroad benefits and an application for death benefits," (4) "[a]n autopsy was performed and the preliminary results show that the bullet entry was from behind the left side behind the ear." Additionally, she complains that the search warrant for cellular

telephone records twice recited probable cause that the Appellant had committed "sexual exploitation of minors." Although the Appellant lists these five examples of "fictitious facts," her argument focuses wholly on the references to "an application for death benefits." The State argues that during a pretrial hearing, the prosecutor acknowledged the mischaracterization of the insurance form as one for "death benefits," and the trial court took the curative step of redacting all references to "death benefits" from the record. Further, the State asserts that any other attacks on the veracity of the allegations in the applications for search warrants should have been made by filing a motion to suppress evidence seized via those warrants, but the Appellant failed to do so. We agree with the State.

### (a) Statements Regarding Demeanor and Suicide

The Appellant claims that two statements contained in the applications for search warrants amount to "fictitious facts" and prosecutorial misconduct, to wit: (1) "[t]here was a small amount of blood on [the victim's] left hand which was inconsistent with suicide" and (2) "[the Appellant's] demeanor and statements were not consistent with the crime scene." Other than merely listing these two examples, the Appellant presents no argument concerning them. Accordingly, these claims are waived. Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. 10(b). The Appellant is not entitled to relief as to a claim of prosecutorial misconduct related to these two statements.

### (b) Death Benefits Reference

The Appellant claims that the affidavits for the search warrants contained the following "fictitious fact[]" which amounted to prosecutorial misconduct: "[f]ound in the initial search was a download of [the victim's] Norfolk Southern Railroad benefits and an application for death benefits." The Appellant filed a motion in limine to preclude references to the insurance form as an "application for death benefits" when the document was actually a customer service request form. At the May 18, 2017 pretrial hearing, the prosecutor agreed to "call the document in question a customer service request for voluntary benefits," having admitted that a previous prosecutor mistook the form for a "application for death benefits" in several pretrial pleadings. The trial court ordered all references to a "death benefits" application to be redacted from the technical record. At trial, Mr. Tuttle testified that the insurance form was a "living owner" document often used for a change of beneficiary. He also said that he had no knowledge of the document being characterized previously as a "death benefits" application. All references to a "death benefits'" application at trial were elicited on cross-examination by the Appellant. The mischaracterization of the insurance form was corrected before trial. Although the Appellant filed a motion to suppress the search warrant for cellular telephone records, the Appellant failed to directly challenge the search warrants at issue in this claim. The Appellant cannot claim prosecutorial misconduct as to this allegation.

- 51 -

### (c) Location of the Bullet Wound

The Appellant contends that the affidavits for the search warrants contained the following "fictitious fact[]" which amounted to prosecutorial misconduct: "[a]n autopsy was performed and the preliminary results show that the bullet entry was from behind the left side behind the ear." The record reveals that during cross-examination at trial, Lieutenant Upton explained his confusion regarding the location of the bullet wound. He said,

> When I made the application for the search warrant, the understanding that we had was the bullet was near the ear. It does say that it was behind the left side, behind the ear, and the photo [does] not show that it's behind the ear, it's like even with it on top . . . .

Lieutenant Upton further stated that "it's hard to explain, like it's not necessarily behind it or front, but kind of equal with it on the top, near the top of his head." To the extent that the Appellant attempts to undermine the veracity of information contained in the search warrants, the Appellant failed to challenge these search warrants directly via a pretrial motion to suppress. See Tenn. R. Crim. P. 12(b). The confusion concerning the location of the bullet wound was thoroughly addressed at trial. The Appellant is not entitled to relief on this issue.

### (d) Sexual Exploitation of Minor Reference

Finally, the Appellant filed a motion to suppress challenging the search warrant to obtain the Appellant's cellular telephone records. The Appellant alleged that the search warrant application did not comply with Tennessee Rule of Criminal Procedure 41 because it contained references to "sexual exploitation of a minor," rather than "homicide." The State acknowledged that the search warrant application contained two references to sexual exploitation of a minor: where the "Ref." line read "sexual exploitation of a minor" and once again where the document read "a specific criminal offense has been committed, to wit: sexual exploitation of a minor." The State argued that the application and the ensuing search warrant otherwise contained true and accurate information, including the correct reference to the investigated offense as "homicide." The State argued that the inclusion of "sexual exploitation of a minor' language was an "unintentional clerical error" that did not invalidate the entire warrant under the good faith exception. See State v. Davidson, 509 S.W.3d 156, 185-86 (Tenn. 2016).

At the January 9, 2017 hearing, the prosecutor acknowledged that the reference inadvertently remained on the affidavit from a previous form and was not relevant to the

instant case. The prosecutor described the references to sexual exploitation of a minor as "cut and paste" errors and said, "It's all good faith error, a clerical error, and a mistake by the police officers that should not invalidate the warrant." The trial court found that

> by referencing the crime [of] sexual exploitation of a minor, in the application for a search warrant in the actual affidavit portion, that the officer made a clerical error, and therefore the Court finds that the good faith exception is applicable in this case and the motion to suppress is denied.

The State acknowledged and explained the misstatements contained in the application for a search warrant. We conclude that the Appellant cannot establish prosecutorial misconduct through this claim.

### (3) "Abusive" Objections

The Appellant contends that the prosecutors engaged in "abusive" objections by making "frivolous and unwarranted objections in the presence of the jury." Although the Appellant's general assertion implies that misconduct occurred throughout the trial, she specifically argues that the prosecutors repeatedly objected during Allison Morton's testimony. The State responds that the prosecutors objected to the Appellant's attempts to elicit evidence that the trial court had previously ruled was inadmissible.

A review of the record reveals approximately twenty-five objections made by the prosecutor during Ms. Morton's direct examination. Numerous objections were made on the basis of hearsay when Ms. Morton began to testify as to statements made to her by the victim or the Appellant. Most of the objections, however, occurred immediately following a jury-out hearing when the Appellant attempted to elicit specific instances of conduct to show the Appellant's character in violation of the trial court's limitation of such evidence of reputation or opinion evidence. See Tenn. R. Evid. 405(a). "The State has a legitimate interest in the outcome of a proceeding and, as such, the State has a legitimate right in advocating its interpretation of applicable law regarding the admissibility of evidence." State v. Rimmer, 250 S.W.3d 12, 42 (Tenn. 2008). While some of the objections were repetitive, they occurred in that manner only to the extent in which the Appellant repeatedly attempted to elicit testimony contrary to the trial court's specified limitations. Notably, the Appellant does not raise any issues concerning the trial court's limitation of testimony or rulings on the objections. The objections complained of do not rise to the level of prosecutorial misconduct. The Appellant cannot prevail on this allegation.

### (4) "Obstreperous" Objections

Next, the Appellant complains that the prosecutors "made frivolous and unwarranted objections" during the Appellant's cross-examination of Lieutenant Upton, with citations to approximately twelve instances of alleged misconduct. The record reveals that the prosecutors objected approximately fifteen times during the cross-examination of Lieutenant Upton. Several of the objections were overruled, some were corrected by Appellant's counsel by reformulating the question, and some lines of questioning were abandoned by Appellant's counsel altogether. The trial court sustained only a few objections because the Appellant's questions encroached upon expert testimony or became unduly repetitive. Again, the Appellant does not raise any issues concerning the trial court's limitation of testimony relative to these objections. Furthermore, the objections do not rise to the level of prosecutorial misconduct. See id. The Appellant is not entitled to relief as to this sub-issue.

The Appellant also claims within this argument that the prosecutors made "wildly abusive accusations against [the Appellant's] trial counsel" concerning the pill counts in the victim's prescription bottles. Although the Appellant cites to the agreed stipulation filed on September 21, 2017 concerning the pill counts, the Appellant fails to include a citation to the record wherein the objectionable "accusations" occurred. This issue is waived for inadequate briefing. See Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b).

### (5) False Accusation Regarding Couch

Finally, the Appellant contends that the prosecutors made "false" accusations of destruction of evidence against the Appellant concerning the removal of the couch from the living room. The Appellant's argument does not accurately cite to the appellate record wherein this alleged accusation occurred. Therefore, this claim is waived for inadequate briefing. See Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b).

### E. Cumulative Error

The Appellant argues that the cumulative effect of errors in this case warrants a reversal of her conviction. Specifically, the Appellant contends that the trial court erred by admitting hearsay testimony, excluding the testimony of her expert witnesses, permitting prosecutorial misconduct, and excusing the State's failure to preserve evidence. The Appellant further contends that "[i]n addition to the errors pled above, the trial court committed many other errors that amount to cumulative error." The Appellant asserts that the trial court erred by allowing testimony regarding the victim's religious beliefs and his disapproval of suicide. The Appellant maintains that the trial court erred by granting the State's motion to quash the defense's subpoenas for the personnel files of the State's law enforcement agents. Finally, the Appellant contends that during its case-in-chief, the State violated Rule 404(b) by accusing the Appellant "of bad acts in her marriage for actions as

- 54 -

innocent as visiting her family in Georgia." The State responds that the trial court did not commit any errors during the trial proceedings; therefore, the Appellant is not entitled to cumulative error relief. Further, the State argues that the Appellant "misuses the cumulative error doctrine as a placeholder for miscellaneous claims . . . [which] are waived because they were not included in [the Appellant's] Statement of the Issues." We agree with the State.

Initially, we note:

> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial. "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings."

State v. Hester, 324 S.W.3d 1, 77 (Tenn. 2010) (citations omitted). Because we have concluded that the trial court committed no errors, the Appellant is not entitled to relief under the cumulative error doctrine.

Nevertheless, the Appellant attempts to raise as cumulative error additional claims regarding the admission of the victim's religious beliefs and his disapproval of suicide, the quashing of the defense's subpoenas for the personnel files of the State's law enforcement agents, and the violation of Rule 404(b) that were not raised properly as issues elsewhere in her brief. The State correctly states that the "additional, cursorily briefed claims in the Appellant's] final section on cumulative error . . . are all waived and meritless." In response, the Appellant argues that Tennessee Rule of Appellate Procedure 27(a)(4) "states only that a brief shall contain, 'A statement of issues presented for review.'" However, we disagree with her argument that "[n]o directive for sub-issues can be found in [State v. Williams, 914 S.W.2d 940, 948 (Tenn. Crim. App. 1995)] or in Rule 27(a)(4)."

The rationale behind the cumulative error doctrine is to address the effects of errors which were raised earlier in the appellate brief(s) but that individually might not have entitled a defendant to relief but that cumulatively tainted the result of the proceedings. The cumulative error doctrine is not a tool with which to shoehorn issues into a brief that have not been raised previously. As Williams cautioned, "[p]arties should refrain from incorporating several separate and distinct errors into a single issue." Williams, 914 S.W.2d at 948. Instead, "[a] separate issue should be presented for each error raised in the appellate court." Id. "An issue may be deemed waived when it is argued in the brief but

is not designated as an issue in accordance with Rule 27(a)(4)." State v. Stephen Douglas Smith, No. M2017-00216-CCA-R3-CD, 2018 WL 4026496, at *7 (Tenn. Crim. App. at Nashville, Aug. 22, 2018) (citing Mobley v. State, 397 S.W.3d 70, 104 (Tenn. 2013); Hodge v. Craig, 382 S.W.3d 325, 334 (Tenn. 2012)).  The Appellant failed to comply with the rules of appellate briefing.  Her additional issues are waived.

### III. Conclusion

Based upon the oral arguments, the appellate record, and the parties' briefs, we affirm the judgment of the trial court convicting the Appellant of first degree premeditated murder and sentencing the Appellant to life imprisonment.

_____
NORMA MCGEE OGLE, JUDGE